Filed 7/9/21 (review denied 11/10/21; reposted with Supreme Court order and statement)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL RAMESH HAYTASINGH et al., | D076228 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2014-00082437-CU-PO-CTL) |
| CITY OF SAN DIEGO et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge. Reversed.

McDougal, Love, Boehmer, Foley, Lyon & Canlas, Steven E. Boehmer and M. Anne Cirina for Plaintiffs and Appellants.

Mara W. Elliott, City Attorney, George F. Schaefer, Assistant City Attorney, and Catherine A. Richardson, Deputy City Attorney, for Defendants and Respondents.

I.

INTRODUCTION

Plaintiffs Michael Ramesh Haytasingh and Crystal Dawn Haytasingh, appeal from a judgment entered in favor of defendants, City of San Diego

(City) and Ashley Marino, a City lifeguard, after a jury trial. The plaintiffs sued the defendants after an incident that occurred at Mission Beach in San Diego in August 2013, while Michael Haytasingh[1] was surfing and defendant Marino was operating a City-owned personal watercraft. Although the parties offered different versions of what occurred that day, the plaintiffs alleged in their complaint that Marino was operating her personal watercraft parallel to Haytasingh, inside the surf line, when she made an abrupt left turn in front of him. In order to avoid an imminent collision with Marino, Haytasingh dove off of his surfboard and struck his head on the ocean floor. Haytasingh suffered serious injuries, including a neck fracture. The plaintiffs alleged that Marino was negligent in her operation of the personal watercraft.

Prior to trial, the trial court granted the defendants' motion for summary adjudication of the plaintiffs' negligence cause of action. The court determined that Government Code section 831.7 (section 831.7), which precludes the imposition of liability on a public entity or public employee for injuries that "aris[e] out of" hazardous recreational activities, and defines "hazardous recreational activity" to include surfing, provided complete immunity to the defendants on the plaintiffs' negligence cause of action. (§ 831.7, subd. (b)(3).) After the trial court granted summary adjudication as to plaintiffs' claim of ordinary negligence, the plaintiffs amended their complaint to allege that they were entitled to relief pursuant to two statutory exceptions to the statutory immunity provided for in section 831.7: (1) that Marino's conduct constituted an "act of gross negligence" that was "the

---

[1] We will refer to Michael Haytasingh by his last name, and to the extent that we refer to other individuals in his family, we will identify them with respect to their relationship to Michael Haytasingh.

2

proximate cause of the injury" (§ 831.7, subd. (c)(1)(E)) and (2) that the City failed to "guard or warn of a known dangerous condition or of another hazardous recreational activity known to the public entity . . . that is not reasonably assumed by the participant as inherently a part of the hazardous recreational activity out of which the damage or injury arose" (§831.7, subd. (c)(1)(A)). The case proceeded to trial, and a jury ultimately found in favor of the defendants.

On appeal, the plaintiffs challenge the trial court's summary adjudication ruling. Specifically, the plaintiffs contend that the trial court erred in concluding that the immunity granted to public entities and their employees under section 831.7 barred plaintiffs from pursuing a cause of action for ordinary negligence against the City and Marino.

The plaintiffs also contend that the trial court erred when it concluded, prior to instructing the jury, that the City and its lifeguards are not required to comply with the state's basic speed law set forth in Harbors and Navigation Code section 655.2.[2] As a result of the trial court's determination

---

[2]    Harbors and Navigation Code section 655.2 places a five mile per hour speed limit on machine-propelled vessels that operate in certain areas. The statute provides as follows:

> "(a) Every owner, operator, or person in command of any vessel propelled by machinery is guilty of an infraction who uses it, or permits it to be used, at a speed in excess of five miles per hour in any portion of the following areas not otherwise regulated by local rules and regulations:

> "(1) Within 100 feet of any person who is engaged in the act of bathing. A person engaged in the sport of water skiing shall not be considered as engaged in the act of bathing for the purposes of this section.

> "(2) Within 200 feet of any of the following:

> "(A) A beach frequented by bathers.

3

that Harbors and Navigation Code section 655.2 does not apply to City lifeguards operating machine-propelled vessels, the court did not instruct the jury that City lifeguards are required to obey the vessel speed limits set forth in that provision if they are operating vessels that are not displaying the lights referred to in subdivision (b) of that section. The trial court instead instructed the jury with respect to a San Diego Municipal Code provision that imposes a five mile per hour speed limit on vessels operating within 1000 feet of a beach, but exempts from its speed limit all government employees who are acting in their official capacity. The plaintiffs contend that the court's instructional error with respect to the speed limit issue constitutes reversible error because the state's basic speed law is relevant to the standard of care that Marino was obliged to meet, and is therefore relevant to whether Marino's conduct constituted an extreme departure from the standard of care, as required for a finding of gross negligence.

We conclude that the trial court did not err in determining that section 831.7 provides defendants with complete immunity with respect to the plaintiffs' cause of action for ordinary negligence, given that Haytasingh's injuries arose from his participation in a hazardous recreational activity on public property. The language of section 831.7 is broad; it provides immunity

"(B) A swimming float, diving platform, or lifeline.

"(C) A way or landing float to which boats are made fast or which is being used for the embarkation or discharge of passengers.

"(b) This section does not apply to vessels engaged in direct law enforcement activities that are displaying the lights prescribed by Section 652.5. Those vessels are also exempt from any locally imposed speed regulation adopted pursuant to Section 660."

4

from liability to public entities and their employees for ordinary negligence with respect to "any damage or injury to property or persons arising out of [an individual's participation in a] hazardous recreational activity" conducted on the property of a public entity. (§ 831.7, subds. (a), (b).)

However, we also conclude that the trial court erred in determining that Harbors and Navigation Code section 655.2's five mile per hour speed limit does not apply to City lifeguards, and in instructing the jury that all employees of governmental agencies acting within their official capacities are exempt from the City's five mile per hour speed limit for water vessels that are within 1,000 feet of a beach under San Diego Municipal Code section 63.20.15. We conclude that the error was prejudicial. We therefore reverse the judgment and remand for further proceedings.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

On August 2, 2013, the plaintiffs, together with their children and foster son, traveled from their home in Monterey to San Diego. The following day, the group went to Mission Beach, where Haytasingh and his foster son went surfing. Haytasingh had begun surfing when he was 16 years old; at the time of the incident, he had been surfing for approximately 22 years. Haytasingh surfed with various of his children during multiple sessions that day. During one of the earlier surfing sessions, Haytasingh noticed a lifeguard on a personal watercraft. He mentioned to his foster son to "be careful of the jet ski" because "[i]f it rolls over, it could kill us."

Marino was on duty as a lifeguard at Mission Beach on August 3, 2013. In the course and scope of her employment, Marino was operating an 11.5-foot personal watercraft. The personal watercraft was outfitted with a rescue

5

sled, which resulted in a total length for the personal watercraft and sled of approximately 15 feet. The personal watercraft was not equipped with lights of any kind or brakes. At the time of the incident, Marino was assisting another lifeguard in performing a "Code S," which involved separating swimmers and surfers into their respective zones in the water.[3]

At approximately 1:50 p.m., Haytasingh and his foster son went out for a surfing session. The pair paddled out, and "moved south in an effort to distance themselves from Marino." Haytasingh saw Marino on the personal watercraft idling about 15 feet north of his location. Haytasingh was able to catch a wave and began surfing toward the shore; Haytasingh's foster son had been unable to catch the wave. Haytasingh estimated that the wave he was riding was approximately 3 feet high and that he was traveling at a speed of approximately 8 to 10 miles per hour.

Haytasingh was traveling east on his surfboard, and noticed the personal watercraft travelling parallel to him on his right side.

According to Haytasingh, he had been riding the wave for approximately seven seconds when "the jet ski and the lifeguard speed up and then take an immediate left right in front of me." Haytasingh believed that the personal watercraft was approximately 10 feet in front of him. In response to the personal watercraft being in that location, he "bailed off to the right," jumping off of his surfboard. Haytasingh hit his head on the ocean floor. When he surfaced, he saw Marino. Haytasingh asked her what she was doing, and after feeling numbness and tingling all over his body, asked her for help.

---

[3]    A checkered flag near a lifeguard tower at Mission Beach demarcates the surf zone and the swim zone. The surf zone is to the north of the checkered flag, and the swim zone is to the south.

Marino offered a different version of the relevant events. According to Marino, she was traveling in a southerly direction, approximately 20 to 30 feet offshore, where the water is approximately two feet deep. She estimated that she was traveling at a rate of 10 to 15 miles per hour heading southbound inside the surf line. Marino observed Haytasingh on his surfboard and noticed that he appeared to be preparing to push up with his arms. She believed that she was approximately 15 to 20 feet away from Haytasingh when she first noticed him, and thought that if she continued on her trajectory, she would collide with him. Marino decided to execute an evasive maneuver by making a U-turn toward the shore, which was to her left, and then proceed in a northerly direction. Two to three seconds passed from the time Marino saw Haytasingh to the time she turned to the left to begin her U-turn maneuver. It took Marino approximately 5 to 10 seconds to make the turn. She estimated that she was traveling at between 5 to 15 miles per hour during the turn, and that the radius of her turn was 15 to 25 feet. She began the turn when she was approximately 20 feet away from Haytasingh, and estimated that the closest she got to Haytasingh was between 15 and 20 feet. Marino acknowledged that she lost sight of Haytasingh at some point during the turn. She denied that she rode the wave parallel to Haytasingh, and also denied that she cut him off. She acknowledged that she did not see him dive off of his surfboard.

After Marino began to travel northward, she made another full U-turn and headed south. She saw Haytasingh standing in shallow water. He told her that he had hit his head on the ocean floor, and said something to the effect, " 'I saw you coming and you scared me.' "

Haytasingh suffered a neck fracture and other injuries as a result of the incident. He had to undergo numerous surgeries, including a neck fusion

surgery, thyroplasty, and insertion of a feeding tube, and he developed a seizure disorder associated with a traumatic brain injury. Haytasingh uses a wheelchair full time as a result of the incident.

B. *Procedural background*

The plaintiffs filed their initial complaint asserting causes of action for damages arising from the defendants' alleged negligence, willful misconduct, recklessness, and gross negligence, as well as a cause of action asserted by Crystal for loss of consortium, in January 2014.

In August 2016, the trial court ruled in favor of the defendants on their motion for summary adjudication as to the plaintiffs' first cause of action for negligence, but permitted the remaining causes of action to proceed. The trial court concluded that the defendants were entitled to absolute immunity from plaintiffs' claim for ordinary negligence that arose out of Haytasingh's participation in a hazardous recreational activity, pursuant to section 831.7.

The plaintiffs sought and were granted leave to file an amended complaint. Their First Amended Complaint set forth causes of action for 1) negligence, 2) loss of consortium, 3) willful misconduct, recklessness, gross negligence, and 4) gross negligence by a public entity or public employee, as permitted under section 831.7, subdivision (c)(1)(A)(E). The defendants answered the First Amended Complaint, and then filed a new motion for summary adjudication, seeking adjudication of the fourth cause of action in the First Amended Complaint alleging gross negligence by a public entity or public employee. The trial court denied the defendants' motion for summary adjudication of the fourth cause of action in the First Amended Complaint, and the matter proceeded to trial.

8

A jury trial commenced on March 13, 2019.  The trial was held over 15 days.  A total of 30 percipient and expert witnesses testified, including Haytasingh and Marino.

At the conclusion of the evidence, the jury was provided with a special verdict form to complete.  The first question on the special verdict form asked the jury, "Was Ashley Marino grossly negligent?"  The jury responded by marking an "X" on the line next to the answer "No."  Because the jury responded "No" to this question, the jury did not answer question two, which was, "Was Ashley Marino's gross negligence a substantial factor in causing harm to Michael Ramesh Haytasingh?"

Question three asked the jury, "Was the City of San Diego grossly negligent?"  The jury marked an "X" on the line next to the answer "No."  Because the special verdict form instructed the jury to stop answering questions once it determined that Marino and the City were not grossly negligent, the jury left the remainder of the special verdict form blank.[4]

The trial court entered judgment for defendants on May 14, 2019.  The plaintiffs filed a timely notice of appeal from the judgment.

### III.

### DISCUSSION

A. *The trial court's ruling that Government Code section 831.7 provided the City and Marino with complete immunity from plaintiffs' cause of action for negligence*

The plaintiffs contend that the trial court erred in granting summary adjudication of their cause of action for ordinary negligence against Marino and the City based on the theory that the defendants were absolutely

---

4      The remainder of the special verdict form involved questions regarding damages and comparative negligence.

9

immune from a cause of action for ordinary negligence pursuant to section 831.7. According to the plaintiffs, section 831.7 is a property based immunity that does not apply to immunize Marino's conduct under the facts of this case. Specifically, the plaintiffs argue that Marino's action in turning left in front of Haytasingh while he was surfing was "an independent act that did not arise from the activity of surfing," and that the cases in which hazardous recreational activity immunity has been applied "are distinguishable from the instant case because those cases all arise out of dangerous condition of public property claims, not an accident where an employee of a public entity . . . drives a [personal watercraft] into [a victim]."

1. *Additional procedural background*

The defendants moved for summary judgment and/or summary adjudication on a number of grounds. As relevant to this appeal, the defendants argued that they were entitled to summary adjudication of the plaintiffs' claim for ordinary negligence against Marino and the City on the ground that the claim was barred by the hazardous recreational activity immunity provided for by section 831.7. Specifically, the defendants argued that they were wholly immune from general negligence liability because Haytasingh was injured while he was surfing, and surfing is specifically defined in section 831.7 to be a hazardous recreational activity covered by the statutory provision. Therefore, the defendants contended, the City and Marino could not be liable for negligence, even if Marino was negligent on the day of the incident.

After full briefing, the trial court held a hearing on the motion. The court took the matter under submission and later denied the defendants' motion for summary judgment as to the entire complaint, but granted summary adjudication "as to the 1st cause of action for negligence." The

10

court determined that the plaintiffs "cannot avoid the application of section 831.7 [given] the fact that Michael was injured when he tried to avoid a collision with a PWC while surfing."

After the trial court granted summary adjudication of the claim for general negligence, the plaintiffs sought leave to amend their complaint to add allegations that certain exceptions to hazardous recreational activity immunity under section 831.7 applied. The trial court granted plaintiffs leave to amend, and the plaintiffs filed a First Amended Complaint, which added a fourth cause of action in which the plaintiffs alleged that two exceptions to the hazardous recreational activity immunity provided for in section 831.7 applied. Specifically, the plaintiffs alleged (1) that the defendants failed to guard or warn of the separate hazardous recreational activity of a City lifeguard operating a personal watercraft too close to Haytasingh while he was surfing, which was a hazardous recreational activity that was not reasonably assumed by Haytasingh to be inherent in the activity of surfing,[5] and (2) that Marino's conduct during the incident constituted gross negligence, such that she and the City were liable notwithstanding the bar to liability for ordinary negligence[6].

---

[5] This language tracks the statutory language for one of the exceptions to the immunity provided for in section 831.7. (See § 831.7, subd. (c)(1)(A) [retaining public entity liability for, among other things, "[f]ailure of the public entity or employee to guard or warn of a known dangerous condition or of another hazardous recreational activity known to the public entity or employee that is not reasonably assumed by the participant as inherently a part of the hazardous recreational activity out of which the damage or injury arose"].)

[6] Subdivision (c)(1)(E) of section 831.7 creates an exception to the hazardous recreational activity immunity where "[a]n act of gross negligence

11

The case proceeded on the plaintiffs' First Amended Complaint.  The jury was not asked to decide whether Marino's actions on the day of the incident constituted ordinary negligence.

2. *Standards of review from the grant of a motion for summary adjudication*

The plaintiffs claim that the trial court erred in granting summary adjudication of their claim for ordinary negligence in favor of the defendants on the ground that the defendants are immune from such a claim under section 831.7.

"A party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty . . . ."  (Code Civ. Proc., § 437c, subd. (f)(1).)  "A motion for summary adjudication may be made by itself or as an alternative to a motion for summary judgment and shall proceed in all procedural respects as a motion for summary judgment."  (*Id.*, subd. (f)(2).)

"A summary adjudication is properly granted only if a motion therefor completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty."  (*Hartline v. Kaiser Foundation Hospitals* (2005) 132 Cal.App.4th 458, 464.)  We review a trial court's order granting or denying summary adjudication de novo.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.)  In reviewing such an order, we exercise our independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to

_____

by a public entity or a public employee . . . is the proximate cause of the injury."

12

judgment as a matter of law. (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463.)

   3.  *Public entity liability and immunity*

Public entity liability for an act or omission is governed exclusively by statute. (Gov. Code, § 815, subd. (a).) A public entity may be held vicariously liable for the actions of its employees who are acting within the scope of their employment duties if the employee's conduct would give rise to a cause of action against the employee. (Gov. Code, § 815.2, subd. (a).)

Section 831.7 precludes the imposition of liability on a public entity or public employee for injuries "arising out of" hazardous recreational activities conducted on public property. Subdivision (a) of section 831.7 provides that a public entity or public employee is not liable to any person who participates in a hazardous recreational activity "for any damage or injury to property or persons arising out of that hazardous recreational activity."[7] A " 'hazardous recreational activity' " is defined by a nonexclusive list of activities that includes "surfing." (Gov. Code, § 831.7, subd. (b)(1)–(3); *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 154 (*Avila*).)

Section 831.7 also provides five exceptions to hazardous recreational activity immunity. (Gov. Code, § 831.7, subd. (c)(1)(A)–(E).) As relevant here, these exceptions include the failure to warn or guard against a

---

[7]     Subdivision (a) provides in full: "Neither a public entity nor a public employee is liable to any person who participates in a hazardous recreational activity, including any person who assists the participant, or to any spectator who knew or reasonably should have known that the hazardous recreational activity created a substantial risk of injury to himself or herself and was voluntarily in the place of risk, or having the ability to do so failed to leave, for any damage or injury to property or persons arising out of that hazardous recreational activity." (Gov. Code, §831.7, subd. (a).)

dangerous condition or another hazardous recreational activity that was not assumed by the participant as an inherent part of the activity out of which the injury arose (*id.*, subd. (c)(1)(A)) and conduct that amounts to gross negligence by a public entity that proximately caused the injury (*id.*, subd. (c)(1)(E)).[8]

4. *Analysis*

The plaintiffs argue that the trial court erred in granting the defendants' motion for summary adjudication of the plaintiffs' negligence cause of action, and that the error "denied [the plaintiffs] the right to a jury trial on the merits of their negligence cause of action." Essentially, the plaintiffs argue that section 831.7 does not limit the liability of a public employee/entity for negligent acts, but instead, operates to limit a public entity's liability for property-based claims. The plaintiffs assert that "[t]his is not a dangerous condition of public property case involving a claim that Mr. Haytasingh was injured as a result of surfing and the condition of the land caused his injuries. Instead, this is a case of negligence on the part of LG Marino wherein she operated the PWC in such a negligent manner so as

---

[8]    The plaintiffs alleged two theories under the cause of action they titled "FOURTH CAUSE OF ACTION  [¶]  (Act of Gross Negligence By A Public Entity Or A Public Employee (Gov. Code §831.7(c)(1)(A)(E))."  Pursuant to the first theory, the plaintiffs alleged that the act of operating a personal watercraft is a "hazardous recreational activity" and that the City and Marino failed to guard or warn of this activity, and in the second, they alleged that Marino's conduct on the date of the incident was an "extreme departure from what a reasonably careful person would do in the same situation . . . and constituted an act of gross negligence . . . ."  On appeal, neither party has distinguished between these two theories of liability; both parties focus on the theory that Marino's conduct amounted to gross negligence, and this theory is relevant to the issue we address in part III.B of this opinion.

14

to cause Mr. Haytasingh to dive off of his surfboard and sustain personal injuries."

Section 831.7, the immunity statute at issue, provides in relevant part:

> "(a) Neither a public entity nor a public employee is liable to any person who participates in a hazardous recreational activity . . . for any damage or injury to property or persons arising out of that hazardous recreational activity.
>
> "(b) As used in this section, 'hazardous recreational activity' means a recreational activity conducted on property of a public entity that creates a substantial, as distinguished from a minor, trivial, or insignificant, risk of injury to a participant . . . 'Hazardous recreational activity' also means: . . . surfing
>
> "(c) (1) Notwithstanding subdivision (a), this section does not limit liability that would otherwise exist for any of the following:
>
> "(A) Failure of the public entity or employee to guard or warn of a known dangerous condition or of another hazardous recreational activity known to the public entity or employee that is not reasonably assumed by the participant as inherently a part of the hazardous recreational activity out of which the damage or injury arose.
>
> "[¶] . . . [¶]
>
> "(E) An act of gross negligence by a public entity or public employee that is the proximate cause of the injury." (Gov. Code, §831.7.)

The plaintiffs challenge the trial court's interpretation of section 831.7 as providing immunity to Marino and the City with respect to a cause of action for ordinary negligence. They argue that section 831.7 was intended to provide property-based immunity and was not intended to extend to claims

15

based in tort.  Plaintiffs' contention requires us to interpret section 831.7 to determine whether it provides immunity against a cause of action that is based on a City employee's alleged negligent act.

" 'Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' " (*Jarman v. HCR ManorCare, Inc.* (2020) 10 Cal.5th 375, 381.)

The plain language of the statute provides broad immunity to public employees and entities with respect to any injury or damage that occurs while an individual is participating in a "hazardous recreational activity."  As noted, subdivision (a) of section 831.7 provides that a public entity is not liable to any person who participates in a hazardous recreational activity "for *any* damage or injury to property or persons arising out of that hazardous recreational activity."  (Italics added.)  The language of the statute is broad and unambiguous; it is not limited to claims based on premises liability or other property-based claims.  Rather, the focus of the statute is participation in a hazardous recreational activity.  This court has held that the language is so broad that it provides immunity for injuries beyond those that are " 'solely attributable' to the hazardous recreational activity" itself.  (*Decker v. City of*

16

*Imperial Beach* (1989) 209 Cal.App.3d 349, 355 (*Decker*).) In concluding that the immunity granted in section 831.7 is sufficiently broad to encompass liability that would otherwise arise from negligently inflicted injuries that occurred when a sheriff's dive team unsuccessfully attempted to rescue a surfer utilizing an outdated and ineffective rescue method, the *Decker* court explained the broad scope of the immunity provided by section 831.7 as follows:

> "In defining the scope of the hazardous recreational activities immunity, the Legislature did not choose narrow language; the Legislature did not limit the immunity to injuries 'solely attributable' to the hazardous recreational activity. Instead, the Legislature used expansive language to describe the scope of the immunity, stating it applied to '*any* damage or injury to property or persons *arising out of* that hazardous recreational activity.' (Italics added.) This broad language is reasonably susceptible to an interpretation that it was intended to preclude liability for negligently inflicted injuries while rescuing a person who has been participating in a hazardous recreational activity since it can be said the rescue effort 'arises out of' the individual's participation in the hazardous recreational activity." (*Decker*, at p. 355.)

We agree with the *Decker* court that the words utilized by the Legislature in section 831.7 are expansive in scope and immunize public entities and their employees from liability for all injuries that can reasonably be deemed to have arisen out of an individual's participation in a hazardous recreational activity conducted on public property. Further, because the language of section 831.7, subdivision (a) is unambiguous, there is no need to resort to consideration of the legislative history of the provision to ascertain the Legislature's intent with respect to the scope of the grant of the immunity.

We acknowledge that the Supreme Court has described section 831.7 as having been "adopted as a premises liability measure." (*Avila, supra,*

17

38 Cal.4th at p. 157.) The Supreme Court in *Avila* was considering the legislative history of section 831.7 because the court had to interpret an ambiguous term in the provision—i.e., what kinds of unenumerated activities qualify as "recreational activities" for purposes of application of the statute's immunity. (*Avila, supra*, at p. 154.)[9] In discussing the genesis of section 831.7, the *Avila* court explained that at the time section 831.7 was introduced, there was a question as to whether Civil Code section 846, a premises liability statute that provides qualified immunity for landowners against claims by recreational users, extended to immunize public entities. (*Avila,* at p. 156.) Civil Code section 846 states:

> "An owner of any estate or any other interest in real property, whether possessory or nonpossessory, owes no duty of care to keep the premises safe for entry or use by others for any recreational purpose or to give any warning of hazardous conditions, uses of, structures, or activities on those premises to persons entering for a recreational purpose, except as provided in this section."

The *Avila* court explained that there had been a split of authority as to whether the premises liability immunity provided for in Civil Code section 846 extended to public entities, and, as a result, the Legislature began considering "Assembly Bill No. 555 (1983–1984 Reg. Sess.), which proposed new Government Code section 831.7." (*Avila, supra*, 38 Cal.4th at p. 156.)[10]

---

[9]     The activity at issue in *Avila* was an intercollegiate baseball game, during which a player for one team was injured when a ball thrown by the pitcher for the other team hit him in the head. (*Avila, supra*, 38 Cal.4th at p. 152.)

[10]     The Supreme Court ultimately concluded that public entities are not protected by Civil Code section 846 in *Delta Farms Reclamation Dist. v. Superior Court* (1983) 33 Cal.3d 699, 710.

18

The *Avila* court stated that the legislative history of the measure "confirms that Government Code section 831.7 was designed to mirror Civil Code section 846's circumscription of property-based duties." (*Id.* at p. 157.) For example, one of the bill's descriptions provided that "Assembly Bill No. 555, 'by providing a qualified immunity, would limit a public entity's *duty to keep its land safe* for certain recreational users.' (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 555 (1983–1984 Reg. Sess.) as amended May 31, 1983, p. 7, italics added.)" (*Id.* at p. 157.) Thus, the *Avila* court concluded, "Government Code section 831.7 was adopted as a premises liability measure, modeled on Civil Code section 846, and designed to limit liability based on a public entity's failure either to maintain public property or to warn of dangerous conditions on public property." (*Avila*, at p. 157.)

However, the *Avila* court did *not* hold that the immunity provided for in section 831.7 is limited to premises or other property-based claims. In fact, the *Avila* court noted a "tension" between "the legislative history of the statute, which establishes an intent focused exclusively on premises liability claims, and the language the Legislature chose to effectuate its purpose, which conceivably could be applied to a broader range of claims." (*Avila, supra*, 38 Cal.4th at p. 159, citing *Acosta v. Los Angeles Unified School Dist.* (1995) 31 Cal.App.4th 471, 476.) The *Avila* court concluded that it did not have to decide "whether the immunity created by section 831.7 extends only to premises liability claims," because the tension that it identified "can be resolved by acknowledging that school-sponsored and supervised sports activities are not 'recreational' in the sense intended by the statute, and thus section 831.7 does not apply to immunize public educational entities from liability to students for injuries sustained during participation in such activities." (*Avila*, at p. 159.)

19

In this case, however, there is no ambiguity as to whether section 831.7 applies to immunize the City and Marino from liability to a surfer for injuries sustained while surfing, given that "surfing," unlike intercollegiate baseball, *is* specifically identified in the statute as one of the "hazardous recreational activities" for which immunity is provided. (See Gov. Code, § 831.7, subd. (b)(3).) Because we discern no ambiguity in the scope of the immunity provided for in section 831.7 with respect to injuries suffered by a person who is engaged in surfing, there is no reason to look to the legislative history as an aid to interpreting the statute. Indeed, as the *Avila* court noted, there is a clear tension between the sweeping breadth of the immunity provided for in the statute and the legislative history of the statue indicating that it may originally have been intended to provide immunity to public entities for premises liability claims. A comparison of the language of section 831.7 and the language of Civil Code section 846 illustrates this tension. Civil Code section 846 specifically references the lack of a "duty of care to keep the premises safe for entry or use . . . for any recreational purpose or to give any warning of hazardous conditions . . . on those premises." Civil Code section 846 thus ties the immunity to the *condition of the premises* that are being used for a recreational purpose. In contrast, section 831.7 ties the immunity to the *hazardous recreational activity* itself, and not to the condition of the property on which the activity takes place, by negating liability "for any damage or injury to property or persons *arising out of* that hazardous recreational activity." (Italics added.) These statutory provisions are simply not similar; section 831.7 clearly provides far broader immunity than Civil Code section 846.[11]

---

[11] While the immunity in section 831.7 is limited to hazardous recreational activities that take place *on public property*, and the statute

20

For this reason, we reject the plaintiffs' reliance on *Klein v. United States of America* (2010) 50 Cal.4th 68, 76 (*Klein*), for the proposition that section 831.7's "immunity does not relieve the [defendants] of their duty to avoid the negligent operation of the [personal watercraft]." The plaintiffs maintain that *Klein* "is the only case that has facts similar to the one before the Court." *Klein* involved a plaintiff who was riding a bicycle recreationally while in a national park when he was struck by a vehicle being driven by a part-time volunteer employee for the United States Fish and Wildlife Service. (*Id.* at p. 71.) The plaintiff sued the United States and the volunteer employee under the Federal Tort Claims Act and set forth two theories of negligence against the defendants—one for the negligent maintenance of the road where the accident occurred, and one based on the vehicular negligence of the volunteer employee. (*Id.* at p. 73.) With respect to the vehicular negligence claim, the United States argued that Civil Code section 846 "shielded it, as owner of the United States Forest Service land on which the accident had occurred, from any negligence liability to a person . . . who was injured while using that land for recreation." (*Klein*, at p. 73.) The federal district court agreed with this contention and granted summary judgment, and the plaintiff appealed. (*Ibid.*)

The Ninth Circuit Court of Appeals certified the following question to the California Supreme Court: "Does [Civil Code] section 846 immunize a landowner from liability for acts of vehicular negligence committed by the landowner's employee in the course and scope of his employment that cause personal injury to a recreational user of that land?" (*Klein, supra*, 50 Cal.4th

---

defines a "hazardous recreational activity" to be an activity "conducted on property of a public entity" (*id.*, subd. (b)), the immunity is not tied to the condition of the public property.

21

at p. 73.) After a full analysis of the statutory language of Civil Code section 846, our Supreme Court concluded that "the plain language of Civil Code section 846's first paragraph" demonstrates that "section 846 does not bar a recreational user's vehicular negligence claim against a landowner." (*Id.* at p. 81.)[12]

The plaintiffs contend that *Klein* supports their position that section 831.7 should not be applied to immunize what amounts to a vehicular negligence claim. They note that the *Klein* court stated that it is "unlikely that California's Legislature intended Civil Code section 846's premises-based language to be interpreted so broadly as to include any and all factors that might create a personal injury risk on one's property. Had the Legislature intended such a broad immunity, it would have been a simple matter to provide in section 846 that landowners owe no duty of care to avoid personal injury to persons using their land for recreation." (*Klein, supra*, 50 Cal.4th at pp. 79–80.) The plaintiffs' further argue that "had the Legislature intended to absolve public entities and their employees from liability for vehicular or vessel negligence, such as negligence while operating a [personal watercraft], they would have provided a corresponding immunity in Government Code section 831.7." However, what the plaintiffs fail to acknowledge is that the *Klein* court was interpreting the scope of immunity provided by section 846, *not* section 831.7; the Legislature *did* provide this type of broad immunity in section 831.7, stating that there shall be no

---

12     The *Klein* court also noted that because the "plain meaning of [Civil Code section 846's] language" was conclusive as to the viability of a vehicular negligence claim, it did not have to "consider the statute's legislative history." (*Klein, supra*, 50 Cal.4th at p. 82.) However, the *Klein* court's "review of that legislative history reveal[ed] . . . that it is consistent with [the court's] conclusion [regarding the plain meaning of the statute]." (*Ibid.*)

liability for a public entity or employee for "*any* damage or injury" that "aris[es] out of [a] hazardous recreational activity." (Gov. Code, § 831.7, subd. (a), italics added.) By utilizing this language, the Legislature rendered irrelevant the theory of liability—i.e., vehicular negligence or a property-based negligence—and instead focused on prohibiting *any* liability for damages arising out of a plaintiff's participation in a hazardous recreational activity conducted on public property.

Even if we agree with the plaintiffs' assertion that "[t]here is a strong public interest in promoting safe driving of . . . vessels such as the [personal watercraft], as set forth in the [Harbors and Navigation] Code," we are not at liberty to ignore the text of section 831.7 and craft a different statute that would more fully align with the statute on which it was apparently originally based (i.e., Civil Code, § 846). Instead, we must examine and apply the language of the statute as it exists. If the Legislature wishes to narrow the scope of the immunity provided to public entities and their employees with respect to hazardous recreational activities, it is incumbent on the Legislature to amend the statute to make this intention clear.

We therefore conclude that the trial court did not err in granting the defendants' motion for summary adjudication of the plaintiffs' negligence claim.

B. *The trial court's decision not to instruct the jury that City lifeguards operating personal watercraft are required to comply with the speed limit provisions of Harbors and Navigation Code section 655.2*

The plaintiffs contend that the trial court committed instructional error by failing to tell the jury, as requested by the plaintiffs, that a basic default speed law for vessels provided for in the Harbors and Navigation Code applies to City lifeguards operating personal watercraft in a situation such as the one in which Marino was operating her personal watercraft. The

23

plaintiffs argue that the trial court originally ruled, in the context of a motion in limine, that Harbors and Navigation Code section 655.2 did apply to City lifeguards, and, that, in reliance on this ruling, counsel for the plaintiffs "spent extensive time eliciting testimony and introducing evidence that these very speed laws are in the lifeguard's training materials" and also asked the percipient witness lifeguards about this basic speed law. However, during discussions of the jury instructions, the trial court decided that the basic speed law provided in Harbors and Navigation Code section 655.2 did not apply to City lifeguards, and thus the court did *not* instruct the jury that this code section applied to City lifeguards such as Marino. According to the plaintiffs, the error in failing to instruct the jury as to the statutory speed law that plaintiffs assert applied to Marino at the time of the incident was prejudicial with respect to their claim for gross negligence and requires reversal.

1. *Additional procedural background*

Prior to trial, the parties filed competing motions in limine relating to whether Harbors and Navigation Code sections 650, et seq. apply to City lifeguards. The plaintiffs contended that Marino violated Harbors and Navigation Code section 655.2, which prohibits the operation of "any vessel propelled by machinery" at a speed in excess of five miles per hour within 100 feet of a bather or within 200 feet of a beach frequented by bathers. (Harb. & Nav. Code, § 655.2, subd. (a)(1), (2)(A).) The plaintiffs filed a request for judicial notice of an Attorney General opinion related to the Harbors and Navigation Code's basic speed laws in support of their contention that these basic speed laws apply to the City's lifeguards when they are operating personal watercraft.

The defendants disputed that this provision of the Harbors and Navigation Code applies to the City's personal watercraft, and sought to exclude any reference to Harbors and Navigation Code section 655.2 or 660 at trial. The defendants argued that Harbors and Navigation Code section 655.2 applies only if the areas in which the relevant vessel is being operated are "not *otherwise regulated* by local rules and regulations." (Harb. & Nav. Code, § 655.2, subd. (a), italics added.) According to the defendants, because the waters off of Mission Beach are regulated by a specific local code provision—i.e., San Diego Municipal Code (SDMC) section 63.20.15—the default speed limit provided for in Harbors and Navigation Code section 655.2, subdivision (a) does not apply in those waters.[13]

In response to the defendant's argument, the plaintiffs asserted that the SDMC provision relied on by the defendants conflicts with the general laws set forth in Harbors and Navigation Code section 655.2, and therefore, SDMC section 63.20.15 is unenforceable under California Constitution, article 11, sections 7 and 11, and under Harbors and Navigation Code section 660, subdivision (a), which specifically requires that any local regulations regarding speed zones "not conflict" with Chapter 5 of the Harbors and Navigation Code.

On the morning trial began and prior to opening statements, the trial court granted the plaintiffs' motion in limine regarding the applicability of the Harbors and Navigation Code, "find[ing] no exemption in this case from"

---

[13] SDMC section 63.20.15 makes it "unlawful for any person in command of any vessel to use it . . . at a speed in excess of five (5) miles per hour within one thousand (1,000) feet of the mean high tide line of the Pacific Ocean adjacent to the shoreline on the City of San Diego." Section 63.20.15 exempts government employees who are acting in their official capacity from this speed limit. (*Id.*, subd. (d).)

the Harbors and Navigation Code's provisions. In explaining its ruling, the court reviewed various provisions of the Harbors and Navigation Code, as well as the SDMC, and ultimately concluded that "the lifeguard . . . who was using a vehicle that was not displaying the lights prescribed by [Harbors and Navigation Code section] 652.5 is subject to the Harbors and Navigation Code."[14]

At trial, counsel for the plaintiffs discussed the Harbors and Navigation Code in his opening statement, and numerous witnesses, both percipient and expert, were examined regarding the five mile per hour speed limit set forth in Harbors and Navigation Code section 655.2, as well as other standards applicable to City lifeguards operating personal watercraft.

During trial, a juror submitted the following question to the court: " 'Will the Harbors and Navigation Code be provided in its entirety to the jury?' " After discussion between the court and the parties' attorneys, the court addressed this juror question by stating, "Also, I wanted to make sure - - I think I told you this at the outset, but I'll tell you again. I will be instructing you on the law you are to use in applying this case [*sic*]. I give you those instructions on the law once all of the evidence is complete. So once we have all of the evidence in, then I instruct you on the law that you are to use in this case."

_____

[14] The discussion provided on the record does not indicate whether the court intended its ruling to be with or without prejudice to raising the applicability of Harbors and Navigation Code at a later point in time. The defendants suggest in briefing on appeal that the trial court's ruling was made "without prejudice." The transcript reveals that the trial court and attorneys had an unreported conference immediately after the court's ruling. It is possible that there was some discussion as to whether the ruling was intended to be without prejudice to further argument at a later point in time.

After the close of evidence, the plaintiffs proposed a set of jury instructions that were modeled on several sections of the Harbors and Navigation Code, including section 655.2.  In response to the plaintiff's proposed instructions, which provided the statutory language of various Harbors and Navigation Code provisions, the trial court stated, "I then have a large set of special instructions under [the] Harbors and Navigation Code, which I've noted I believe are far too confusing to the jurors and unnecessarily cite to the specific code section, which I do not believe the jurors need to know.  Instead, they simply need to know what the law is.  [¶] So I'm not inclined to give in the form provided any of the plaintiff[s'] special instructions.  Certainly some special instructions might be appropriate, but not in the form that was given."

Later, the trial court stated, "I've indicated I am not likely to give special instruction 650.  [¶] . . . [¶] . . . 650 as to the policy of the state.  It's not an instruction on the law.  I'm not inclined to give it."[15]  The court then stated, "I think proposed instruction 651 - - all of these are far too confusing." An attorney for the plaintiffs asked the court, "Could you give some guidance on what you would like to see comport with the CACI so we articulate what the law is[?]"  The court responded, "Yes.  I think it would be appropriate to give some instruction that a surfer is a bather and that a personal watercraft is a vessel.  I think both of those would be appropriate.  So if you wanted to give an instruction that says either or both of those things, I would give it."

---

15    Although the court referred to the instruction as "special instruction 650," it appears that the court was referring to the proposed special instruction that would have provided the text of Harbors and Navigation Code section 650, which states, "It is the policy of this state to promote safety for persons and property in and connected with the use and equipment of vessels and to promote uniformity of laws relating thereto."

27

With respect to the plaintiffs' proposed instruction regarding Harbors and Navigation Code section 655.2, the speed limit provision, the court explained that the instruction would be "appropriate if clarified and made simpler." At that point, defense counsel objected to the inclusion of any instructions based on the Harbors and Navigation Code. Defense counsel argued that Harbors and Navigation Code section 655.2 does not apply "at all" because Marino was operating a City-owned personal watercraft, and the City "is a subdivision of the State" and therefore should be exempt from all application of the Harbors and Navigation Code, pursuant to a provision of the code that exempts from its regulation vessels owned by the state or the state's subdivisions. After further argument concerning the applicability of the Harbors and Navigation Code, generally, as well as specific application of particular sections of the code to City lifeguards, and the interaction between the Harbors and Navigation Code provisions and local speed regulations, the court concluded that it would not instruct the jury with respect to Harbors and Navigation Code section 655.2 (regarding the general speed law) or section 652.5 (regarding the use of blue lights by public safety vehicles), stating, "I don't believe they are applicable." The court indicated that it would give other instructions based on the Harbors and Navigation Code, such as an instruction regarding section 655.7, which relates to general safety standards in the operation of a personal watercraft. Defense counsel continued to object to any instructions based on Chapter 5 of the Harbors and Navigation Code, arguing that none of those provisions apply to the City's lifeguards.

The trial court ultimately provided the jury with the following instructions with respect to the state and local rules governing the use and operation of vessels:

28

"HARBORS & NAVIGATION CODE §§651 AND 651.1

"A surfer is a bather. The act of surfing is the act of bathing. [¶] A personal watercraft ('PWC') or rescue watercraft is a vessel."

"HARBORS & NAVIGATION CODE §655.7(c)

"Every personal watercraft shall, at all times, be operated in a reasonable and prudent manner. Maneuvers that unreasonably or unnecessarily endanger life, limb or property, including but not limited to, operating at a rate of speed and proximity to another vessel so that either operator is required to swerve at the last minute to avoid collision, is unsafe or reckless operation of a vessel."

"HARBORS & NAVIGATION CODE §655(a)

"No person shall use any vessel in a reckless manner so as to endanger the life, limb or property of any person."

"SAN DIEGO MUNICIPAL CODE SECTION 63.20.15

"It is prohibited for any person in command of any vessel to use it or permit it to be used at a speed in excess of five (5) miles per hour within one thousand (1,000) feet of the beach.

"Employees of governmental agencies are exempt from this section while acting in the course of their official duties."

2. *The statutory and municipal code framework at issue*

Plaintiffs contend that Harbors and Navigation Code section 655.2, which provides a default speed limit of five miles per hour for vessels being operated in certain areas of waters subject to California's jurisdiction, applies to City lifeguards and that the trial court erred in refusing to instruct the jury regarding the five mile per hour speed limit. Because a number of

Harbors and Navigation Code provisions are relevant to determining whether Harbor and Navigation Code section 655.2 applies to City lifeguards, and, if so, whether that application is limited to certain circumstances, we set forth the relevant code provisions for ease of reference.

Chapter 5 of the Harbors and Navigation Code is titled "Operation and Equipment of Vessels." The first codified provision of Chapter 5, which is section 650 of the Harbors and Navigation Code, sets forth the public policy of the state with respect to the operation of vessels on waters that are within California's jurisdiction, providing: "It is the policy of this state to promote safety for persons and property in and connected with the use and equipment of vessels and *to promote uniformity of laws relating thereto*." (Italics added.) The following section, section 650.1, defines the scope of Chapter 5's applicability:

> "(a) This chapter shall apply to vessels and associated equipment used, to be used, or carried in vessels used on waters subject to the jurisdiction of this state.
>
> "(b) This chapter, except those sections which expressly indicate otherwise, shall not apply to the following:
>
> "(1) Foreign vessels temporarily using waters subject to state jurisdiction.
>
> "(2) Military or public vessels of the United States, except recreational-type public vessels.
>
> "(3) A vessel whose owner is a state or subdivision thereof, which is used principally for governmental purposes, and which is clearly identifiable as such.
>
> "(4) Ship's lifeboats." (Harb. & Nav. Code, § 650.1.)

Section 652.5 of the Harbors and Navigation Code discusses in detail the use of a "distinctive blue light" that is to be "reserved for public safety vessels." That section provides in relevant part:

> "(a) The use of a distinctive blue light as prescribed by the department is reserved for public safety vessels and may be displayed during the day or night whenever the vessel may be engaged in direct law enforcement activities, including, but not limited to, those activities specified in subdivision (a) of Section 663.7, or public safety activities conducted by a fire department or a fire protection district, where identification of a public safety vessel is desirable or where necessary for safety reasons.
>
> "(b) That light when used shall be in addition to prescribed lights and day signals required by law.
>
> "[¶] . . . [¶]
>
> "(f) For purposes of this section, 'public safety vessel' means a law enforcement, a fire department, or a fire protection district vessel." (Harb. & Nav. Code, § 652.5.)

Harbors and Navigation Code section 655 provides for a general standard of care for the use of vessels and other water-based "devices," and specifies that the Department of Boating and Waterways is to adopt regulations for use of these devices: "No person shall use any vessel or manipulate water skis, an aquaplane, or a similar device in a reckless or negligent manner so as to endanger the life, limb, or property of any person. The department[16] shall adopt regulations for the use of vessels, water skis, aquaplanes, or similar devices in a manner that will minimize the danger to life, limb, or property consistent with reasonable use of the equipment for the

---

16    Chapter 5 defines " '[d]epartment' " to mean the "Department of Boating and Waterways." (Harb. & Nav. Code, § 651, subd. (g).)

purpose for which it was designed." (Harb. & Nav. Code, § 655, subd. (a).) Another provision of the Harbors and Navigation Code sets a similar standard of care for personal watercraft: "Every personal watercraft shall, at all times, be operated in a reasonable and prudent manner. Maneuvers that unreasonably or unnecessarily endanger life, limb, or property, including, but not limited to, jumping or attempting to jump the wake of another vessel within 100 feet of that other vessel, operating the personal watercraft toward any person or vessel in the water and turning sharply at close range so as to spray the vessel or person, or operating at a rate of speed and proximity to another vessel so that either operator is required to swerve at the last minute to avoid collision, is unsafe or reckless operation of a vessel." (Harb. & Nav. Code, § 655.7, subd. (c).)

The specific provision that the plaintiffs contend applies to Marino, and about which the plaintiffs claim the jury should have been instructed, is section 655.2 of the Harbors and Navigation Code, which states, in full:

> "(a) *Every owner, operator, or person in command of any vessel propelled by machinery is guilty of an infraction who uses it*, or permits it to be used, *at a speed in excess of five miles per hour in any portion of the following areas not otherwise regulated by local rules and regulations*:
>
> "(1) Within 100 feet of any person who is engaged in the act of bathing.[17]  A person engaged in the sport of water skiing shall not be considered as engaged in the act of bathing for the purposes of this section.

---

17     Elsewhere the Chapter defines " 'bather' or 'bathing' " as "a person floating, swimming, wading, or bodysurfing, with or without the use of a flotation device, including, but not limited to, floating upon or with the aid of a surfboard, paddle board, surfmat, innertube, life preserver, or air mattress, except a flotation device which is designed to be propelled by sail, mechanical means, power, oars, or paddle." (Harb. & Nav. Code, § 651.1.)

"(2) Within 200 feet of any of the following:

"(A) A beach frequented by bathers.

"(B) A swimming float, diving platform, or lifeline.

"(C) A way or landing float to which boats are made fast or which is being used for the embarkation or discharge of passengers.

"(b) *This section does not apply to vessels engaged in direct law enforcement activities that are displaying the lights prescribed by Section 652.5. Those vessels are also exempt from any locally imposed speed regulation adopted pursuant to Section 660.*"  (Harb. & Nav. Code, § 655.2, italics added.)

Finally, as relevant to this matter, Harbors and Navigation Code section 660 allows local governmental entities to adopt additional regulations related to boats and vessels, but specifies that such regulations must not conflict with Chapter 5 of the Harbors and Navigation Code:

"Any ordinance, law, regulation, or rule relating to vessels, which is adopted pursuant to provisions of law other than this chapter by any entity other than the department, including, but not limited to, any county, city, port authority, district, or any state agency other than the department, shall, notwithstanding any other provision of law, pertain only to time-of-day restrictions, speed zones, special-use areas, and sanitation and pollution control, *and the measure shall not conflict with this chapter* or the regulations adopted by the department. Except as provided in subdivision (c), any measure relating to boats or vessels adopted by any governmental entity other than the department shall be submitted to the department prior to adoption and at least 30 days prior to the effective date thereof."  (Harb. & Nav. Code, § 660, subd. (a), italics added.)

33

The City has adopted regulations applicable to "beaches owned or controlled by the City of San Diego and all waters abutting or adjacent to them within the limits of the City of San Diego, and of all lands owned or controlled by the City, adjoining the waterfront of the Pacific Ocean and the waters of Mission Bay, and it shall be responsible for the control and management of these beaches and lands, and waters abutting or adjacent to them, and of the recreational activities on them."  (SDMC, § 63.20, subd. (a).)

Among the regulations that the City has adopted with respect to the waters abutting City beaches is a vessel speed ordinance, which provides in relevant part:

> "It is unlawful for any person in command of any vessel to use it or permit it to be used at a speed in excess of five (5) miles per hour within one thousand (1,000) feet of the mean high tide line of the Pacific Ocean adjacent to the shoreline on the City of San Diego, with the following exceptions:

> "[¶] . . . [¶]

> "(d) Employees of governmental agencies are exempt from this Section, 63.20.15, while acting in the course of their official duties."  (SDMC, § 63.20.15.)

3. *Analysis*

The plaintiffs argue that the trial court prejudicially erred in failing to instruct the jury that Marino was subject to the general speed limit of five miles per hour provided in Harbors and Navigation Code section 665.2, subdivision (a) at the time of the incident, and instead instructing the jury that Marino was subject only to the terms of SDMC section 63.20.15, which, under subdivision (d), exempts from subdivision (a)'s speed limit government employees like Marino who are acting in their official capacities.

34

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him [or her] which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).)

"The propriety of jury instructions is a question of law that we review de novo." (*Hernandez v. Jensen* (2021) 61 Cal.App.5th 1056, 1064, citing *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475.) When the contention on appeal is that the trial court failed to give a requested instruction, we review the record in the light most favorable to the party proposing the instruction to determine whether the instruction was warranted by substantial evidence. (*Ayala v. Arroyo Vista Family Health Center* (2008) 160 Cal.App.4th 1350, 1358.)

"A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citation.]" (*Soule, supra*, 8 Cal.4th at p. 580.) That is, reversal is appropriate where it is reasonably probable that the party complaining of the instructional error would have obtained a more favorable result in its absence. (*Id.* at p. 571.)

In assessing prejudice from an erroneous instruction, we consider, insofar as relevant, " '(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].' " (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069–1070, quoting *LeMons v. Regents of*

*University of California* (1978) 21 Cal.3d 869, 876.) "A 'miscarriage of justice' exists when, after examining all the evidence, we conclude ' " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " ' [Citation.]" (*Weaver v. Chavez* (2005) 133 Cal.App.4th 1350, 1356.)

> a. *The trial court erred in concluding that Harbors and Navigation Code section 655.2 did not apply to Marino, rendering the court's instructions to the jury erroneous*

The plaintiffs contend that the trial court incorrectly interpreted the law in concluding that Harbors and Navigation Code section 655.2 did not apply to Marino. In response, the defendants first assert that no portion of Chapter 5 of the Harbors and Navigation Code applies to the City or its employees pursuant to section 650.1 of that Chapter, which excludes a "subdivision" of the state from the rules set forth in Chapter 5. The defendants further suggest that "even if Chapter 5 [of the Harbors and Navigation Code] applies, section 655.2 [of the Harbors and Navigation Code] only applies if the waterway is 'not otherwise regulated by local rules and regulations' [(Harb. & Nav. Code, § 655.2, subd. (a))]," and, that "the waters along Mission Beach are regulated by local rules and regulations . . . specifically SDMC section 63.20.15." (Boldface & italics omitted.) Our review of the relevant statutory and municipal code provisions convinces us that the plaintiffs have the better argument.

First, we do not agree with the defendants that section 650.1 of the Harbors and Navigation Code exempts the City from any application of the regulations set forth in Chapter 5 of that code. Section 650.1 exempts from the entirety of Chapter 5 of the Harbors and Navigation Code any "vessel whose owner is a state or subdivision thereof." Chapter 5 of the Harbors and Navigation Code does not define the term "subdivision" in section 650.1 or

36

otherwise indicate the entities the term is intended to cover.  The City asserts that it is a "subdivision" of the state under section 650.1 of the Harbors and Navigation Code.  Although the City may be considered a "subdivision" of the state in certain conceptual, geographic or political senses, it is not necessarily so for all purposes.  Article XI of the California Constitution, which concerns "Local Government," refers to counties, alone, as "legal subdivisions of the [s]tate."  (Cal. Const., art. XI, § 1(a) ["The State is divided into counties which are legal subdivisions of the State"].)  The California Constitution does not reference cities or municipal corporations in this section.  Rather, cities and municipal corporations are discussed in the following section, section 2, of article XI of the California Constitution.  Our state's Constitution has referred to the state's counties as "legal subdivisions" of the state since before 1889.  (See *People ex rel. Graves v. McFadden* (1889) 81 Cal. 489, 497 [noting distinction between counties and "municipal corporations" and noting that the Constitution "reads:  'The several counties, as they now exist, are hereby recognized as legal subdivisions of this state' " (italics omitted)].)  Notably, the California Constitution does not refer to or identify cities or municipal corporations as "legal subdivisions of this state."  Thus, courts have noted that a county is considered a legal subdivision of the state for various purposes.  (See, e.g., *Environmental Law Foundation v. State Water Resources Control Bd.* (2018) 26 Cal.App.5th 844, 867 [in concluding that counties have "fiduciary duties involving groundwater," court noted that "[a] county is a legal subdivision of the state and references to the 'state' may include counties"]; *Center for Biological Diversity, Inc. v. FPL Group, Inc.* (2008) 166 Cal.App.4th 1349, 1370, fn. 19 ["[T]he county, as a subdivision of the state, shares responsibility for protecting our natural resources"]; *Baldwin v. County of Tehama* (1994) 31 Cal.App.4th 166, 175–176 [with

respect to whether state law occupies field of water regulation for purposes of preemption of county regulation of groundwater, court noted that a county is a legal subdivision of the state and "references to 'the State' . . . may include counties"].)

Cases have addressed reasons why the Legislature, at times, may distinguish counties and cities with respect to their legal relationship to the state. For example, in *County of San Mateo v. Coburn* (1900) 130 Cal. 631, 636, the Supreme Court explained that "[a] county is a governmental agency or political subdivision of the state, *organized for purposes of exercising some functions of the state government*, whereas a municipal corporation is an incorporation of the inhabitants of a specified region for purposes of local government." (*Ibid.*, italics added.) This important distinction between counties and cities, with respect to their creation and function, was further described in *Otis v. City of Los Angeles* (1942) 52 Cal.App.2d 605:

> "[R]espondents' contention that the legal status of a municipal corporation is akin to that of a county cannot be sustained either upon reason or authority. . . . [A]gain, section 1 of article XI of our state Constitution provides, 'The several counties, as they now exist, are hereby recognized as legal subdivisions of this state.' It is the free consent of the persons composing them that brings into existence municipal corporations, and they are used for the promotion of their own local and private advantage and convenience, while it is the sovereign will [of the state] which brings into being counties as local subdivisions of the state; and the establishment of such political subdivisions of the state is accomplished without the solicitation, consent or concurrent action of the people residing within them. Cities, therefore, are distinct individual entities, and are not connected political subdivisions of the state. As a matter of fact, municipalities, and particularly charter cities, are in a sense independent political organizations and do not pretend to exercise any functions of the state.

38

They exist in the main for the purposes of local government." (*Id.*, at pp. 611–612.)

"It is evident . . . that cities have reserved to them by law certain powers of self-government within the areas embraced by them that are not possessed by counties even though a county may have incorporated cities within its boundaries." (*Williams v. McClellan* (1953) 119 Cal.App.2d 138, 143.)

In addition, the Legislature will often specifically include the term "cities" or a "city" when defining terms or discussing the entities to which a statute is intended to apply. (See *Rutgard v. City of Los Angeles* (2020) 52 Cal.App.5th 815, 833 ["The Eminent Domain Law applies to 'public entit[ies]' ([Code of Civil Procedure,] § 1245.220), and defines that term to apply broadly to the 'state' itself as well as any 'county, city, district, public authority, public agency, and any other political subdivision in the state' "]; *Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 260 [discussing Government Code section 12926, which "defines terms used in the FEHA statutory scheme," including "[s]ubdivision (d) of that section," which provides that " ' "Employer" includes any person regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly, the state or any political or civil subdivision of the state, *and cities*' " (italics added) with certain exceptions]; see also Lab. Code, § 1960 ["Neither the State nor any county, political subdivision, incorporated city, town, nor any other municipal corporation shall prohibit, deny or obstruct the right of firefighters to join any bona fide labor organization of their own choice"].)

Further, "[t]he Legislature . . . is usually quite specific when it intends the term 'political subdivision' to include *charter cities*." (*City of Redondo*

39

*Beach v. Padilla* (2020) 46 Cal.App.5th 902, 912, italics added.)[18] As the

*Redondo Beach* court explained, "the Government Code often specifies

'charter cities' or 'any city' when defining or utilizing the term 'political

subdivision.'" (*Ibid.*, citing Gov. Code, §§ 53208.5, 53217.5, 53060.1 [setting

various limits on benefits for "members of the legislative bodies of all political

subdivisions of the state, including charter cities and charter counties"],

8557, 8698, 12650, 12424 ["political subdivision" includes "any city, city and

county [or] county"], 37364, subd. (e) ["[t]he provisions of this section shall

apply to all cities, including charter cities"].)[19] And in interpreting statutes,

---

[18]    The Constitution refers to counties as "legal subdivisions" of the state, while some of the statutes mentioned above discuss "political subdivisions" or "civil and political subdivisions" of the state, sometimes defining that term to include entities other than counties or agencies of the state. Harbors and Navigation Code section 650.1 uses the more general term "subdivisions." We have found no authority discussing the differences, if any, between the phrases "subdivision," "legal subdivision," "civil subdivision," or "political subdivision."

[19]    Other statutes also specifically define a "political subdivision" to include charter cities or otherwise specify that the statute at issue applies to charter cities. (See, e.g., Pub. Util. Code, §§ 5810 ["political subdivision" defined as "including, but not limited to, a charter city, county, or city and county"], 21010 ["political subdivision" defined as "any county, city, city and county . . . or other political entity"], 21690.6 ["[t]he provisions of this article shall apply to any airport owned or operated by a political subdivision, including a charter city"]; Rev. & Tax. Code, §§ 30462 [section 30111 prohibits imposition of taxes by "any city, charter city, town, county, charter county, city and county, . . . or other political subdivision or agency of this state"], 18670, subd. (a) ["political subdivision" includes "a city organized under a freeholders' charter"]; Pub. Contract Code, §§ 7203, subd. (c) [applies to "a city, charter city, county, charter county, . . . and any other political subdivision"], 20671, subd. (b) [defining "public entity" as "any city, charter city, city and county, . . . or political subdivision of the state"]; Health & Saf. Code, § 12081, subd. (e) ["no city, county, city and county, or other political subdivision of this state, including, but not limited to, a chartered city,

40

"the Supreme Court and Courts of Appeal have often demanded a clearer indication than the use of a general term," such as " 'a political subdivision' " or even simply the term " 'a city,' " before holding that "a statute is intended to apply to [a] *charter* cit[y.]" (*Redondo Beach,* at p. 913, italics added.) This is because "the term 'political subdivision of the state' has been construed to distinguish counties from 'municipal corporations' with separate and distinct powers and purposes." (*Id.* at p. 913, fn. 7.)

The defendants do not address the fact that the California Constitution does not refer to cities, or in particular, charter cities, as "subdivisions" of the state, while specifically defining counties as such. They offer no competing analysis of the case law identifying the distinctions between counties and cities with respect to the state's governance or power over them and do not address the fact that the Legislature specifically includes and refers to charter cities, in particular, when it intends that they be covered by a statutory provision. Instead, the defendants merely assert, in a single sentence, that the City is a subdivision of the state and cite *People ex rel. Freitas v. City & County of San Francisco* (1979) 92 Cal.App.3d 913, 921 and similar cases for the proposition that "[m]unicipal corporations are political subdivisions of the state." Although *Freitas* does make this statement, the statement is originally derived from the legal discussion in *Hunter v. City of Pittsburgh* (1907) 207 U.S. 161, 178, in which the United States Supreme Court offered a summary of certain "principles [that] have been established"

---

county, or city and county"]; Elec. Code, § 306 [term "city measure" includes "any proposed city charter"]; Veh. Code, § 34002, subd. (a) ["no state agency, city, city and county, county, or other political subdivision of this state, including, but not limited to, a chartered city, city and county, or county, shall adopt or enforce any ordinance or regulation . . . inconsistent with this division"].)

41

by United States Supreme Court precedent regarding the relationship of states to municipal corporations, and noting that the ultimate authority to determine "[t]he number, nature and duration of the powers conferred upon these [municipal] corporations and the territory over which they shall be exercised rests in the absolute discretion of the State." (*Ibid.*) The United States Supreme Court's point was that "[t]he State . . . at its pleasure, may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation," and the federal Constitution offers nothing to protect citizens from the state's exercise of its powers in this respect:

> "In all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. Although the inhabitants and property owners may by such changes suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right by contract or otherwise in the unaltered or continued existence of the corporation or its powers, and there is nothing in the Federal Constitution which protects them from these injurious consequences. The power is in the State and those who legislate for the State are alone responsible for any unjust or oppressive exercise of it." (*Id.* at pp. 178–179.)

It is clear that the United States Supreme Court was not suggesting that California must consider cities or municipal corporations to be "legal subdivisions" of the state or that it must define them as such, but rather, that California, alone, has the power to determine how to define a municipal corporation and confer on it whatever powers it sees fit. In other words, the

United States Supreme Court was using the phrase "political subdivision of the state" as a descriptor of the function and derivation of municipal corporations, not as a legal definition for all purposes. The defendant's other case citations for this proposition are similarly lacking any analysis that would suggest that those courts intended to conclude that a city is a legal subdivision of the state for all purposes. (See *Myers v. City Council of Pismo Beach* (1966) 241 Cal.App.2d 237, 243–244 [referring to cities as "*political subdivisions of the state*" (italics added)—not legal subdivisions—as a shorthand for discussing rule that referendum powers granted "to the people do not extend to 'tax levies,'" and that such rule applies "political subdivisions" governed by general laws, as well as those governed by charters]; *Fenton v. City of Delano* (1984) 162 Cal.App.3d 400, 407 [quoting *Myers*].)

Given that the Constitution treats counties and cities differently, that case law has explained some of the reasons for such a distinction, and that courts have been disinclined to interpret statutes as applying to charter cities when charter cities are not specifically referenced by definition or other statutory language, we conclude that the Legislature did not intend to include charter cities such as the City[20] in the exclusion for "the state or its subdivisions" set forth in section 650.1 of the Harbors and Navigation Code.[21] We therefore reject the defendant's position that the City's vessels

---

[20] The City of San Diego is a charter city. (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1063.)

[21] We need not definitively determine whether the Legislature intended to include counties in the exemption provided in Harbors and Navigation Code section 650.1; the only question before us is whether the City is exempted from all of the provisions of Chapter 5 of the Harbors and Navigation Code as a subdivision of the state. We also have no need to decide whether the speed

are exempt from all regulations set forth in Chapter 5 of the Harbors and Navigation Code because the City is a "subdivision" of the state and therefore exempt under section 650.1 of the Harbors and Navigation Code.

In reaching this conclusion, we acknowledge that Chapter 5 of the Harbors and Navigation Code does not clearly indicate what the Legislature intended with respect to the regulation of various types of publicly owned or operated vessels.  Rather, the interplay between the exemptions outlined in Harbors and Navigation Code section 650.1, subdivision (b) and the speed limit provision in section 655.2, in particular, appears to a create a puzzle for which there is no single satisfactory answer.  In his concurring opinion, J. Dato takes issue with the possibility that the Legislature's statutory language may ultimately result in the application of different boating regulations to different types of governmental entities, despite the fact that these entities may at times provide similar services.  However, if the concurring opinion is correct in its view that the exemption from the regulations set forth in Chapter 5 as set forth in section 650.1, subdivision

---

limit set forth in Harbors and Navigation Code section 655.2 applies to operators of county vessels.  However, we disagree with the suggestion in the concurring opinion that there is no reasonable basis for the Legislature to impose the rules and regulations set forth in Chapter 5 of the Harbors and Navigation Code on cities while exempting counties from these regulations. There could be any number of reasons why the Legislature might determine that different governmental entities should be treated differently with respect to regulation of the operation of vessels and their equipment, such as fiscal reasons related to different funding mechanisms for county and city-provided services, or historical reasons related to a greater need to regulate particular entities.  We need not delve into all of the possible reasons that such a distinction could be drawn; we raise these possible reasons to illustrate that there could be a reasonable basis to treat different governmental entities differently with respect to boating regulations even though these entities may, at times, provide similar governmental services.

(b)(3) of the Harbors and Navigation Code includes *all* governmental vessels, including those owned by cities such as San Diego, it is difficult to discern why there would be any need for the exception to the speed limit set forth in the speed limit statute itself for vessels that are actively engaged in law enforcement and displaying the requisite blue light; any such vessels would presumably be exempted from the speed limit in Harbors and Navigation Code section 655.2, because such vessels are exempted from the entirety of Chapter 5 of the Harbors and Navigation Code. J. Dato infers from this apparent inconsistency that, while the Legislature intended to exempt virtually all government vessels from the regulations in Chapter 5, it must not have *actually* intended to exempt any of those vessels from the speed limit set forth in Harbors and Navigation Code section 655.2. However, Harbors and Navigation Code section 650.1, subdivision (b) requires an *express* indication that a particular provision in Chapter 5 is intended to apply to the exempted vessels in stating: "This chapter, except those sections *which expressly indicate otherwise*, shall not apply to the following . . . ." (Italics added.) There is no express indication in section 655.2 that the speed limit applies to any of the vessels that are exempted from the provisions of Chapter 5 of the Harbors and Navigation Code under section 650.1, subdivision (b).[22] We do not think that it would be appropriate to infer the

---

22    The Legislature has demonstrated that it knows how to expressly indicate its intention to apply a particular provision in Chapter 5 of the Harbors and Navigation Code to vessels that are otherwise exempted from the provisions of Chapter 5 pursuant to the language in section 650.1, subdivision (b). For example, section 656, which is included in Chapter 5 of the Harbors and Navigation Code, contains an express indication of the Legislature's intention to impose the regulation set forth in section 656 on the operators of vessels that would otherwise be exempted under section 650.1, subdivision (b). Among other things, section 656 makes it "the duty of the operator of a vessel involved in a collision, accident, or other casualty, so

application of the speed limit to all of the otherwise exempted vessels under these circumstances. However, given the ambiguity in Harbors and Navigation Code section 650.1, subdivision (b)(3), and particularly in its interaction with the speed limit set forth in section 655.2 of that same code, we respectfully invite the Legislature to consider amending portions of Chapter 5 of the Harbors and Navigation Code to clarify its intent with respect to these provisions.

Having concluded that vessels owned by the City are not exempted from application of the five mile per hour speed limit set forth in section 655.2 of the Harbors and Navigation Code by section 650.1 of that code, we next consider the defendants' assertion that the five mile per hour speed limit provided for in section 655.2 of the Harbors and Navigation Code does not apply because the waterway where this incident occurred is governed by a local ordinance that permits lifeguards like Marino to operate their government-owned vehicles at any rate of speed, without legal limitation. The defendants rely on subdivision (a) of Harbors and Navigation Code

---

far as the operator can do so without serious danger to his or her own vessel, crew, and passengers, to render to other persons affected by the collision, accident, or other casualty that assistance that is practicable and necessary in order to save them from, or minimize any, danger caused by the collision, accident, or other casualty." This provision also requires owners, operators, or others on a board a vessel involved in a casualty or accident to report the casualty or accident as required by the department. (§ 656, subd. (d).) Subdivision (g) of section 656 includes the following significant language: "This section applies to foreign vessels, military or public recreational-type vessels, vessels owned by a state or subdivision of a state, and ship's lifeboats otherwise exempted from this chapter pursuant to Section 650.1." Thus, subdivision (g) of section 656 *expressly* indicates that the provisions of section 656 apply to every operator of every vessel, without exception. This provision demonstrates that when the Legislature wants to "expressly indicate[ ]" that any or all of the exemptions in section 650.1, subdivision (b) do not apply, it will do so with specificity and clarity.

section 655.2, which provides that the speed limit is five miles per hour within 100 feet of a person who is bathing, or within 200 feet of a beach or other areas where people may be entering and exiting the water, where those "areas not otherwise regulated by local rules and regulations." The defendants argue that because the area at issue *was* regulated by a local speed ordinance—i.e., SDMC section 63.20.15—Harbors and Navigation Code section 655.2's speed law does not apply, and instead, only SDMC section 63.20.15 applies. Thus, the defendants' position is that because SDMC section 63.20.15 applies and exempts from any speed limitation all governmental employees who are acting in their official capacity, there is no speed limit that applies to City lifeguards operating personal watercraft in waterways that are within the state's jurisdiction. An examination of the entire statutory framework of Chapter 5 and its purpose, leads us to a different conclusion.

Section 660, subdivision (a) of the Harbors and Navigation Code, which authorizes other entities to adopt local rules or regulations, places limits on the types of rules and regulations that may be adopted, providing that such regulations may "pertain only to time-of-day restrictions, speed zones, special-use areas, and sanitation and pollution control." Section 660, subdivision (a) further requires that any local measure must not conflict with Chapter 5 of the Harbors and Navigation Code. (Harb. & Nav. Code, § 660, subd. (a).)

Under the normal rules of preemption, a local ordinance that conflicts with state law is preempted by the state law and void. (*O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1067.) Thus, the legislative statement in section 660, subdivision (a) of the Harbors and Navigation Code restates general preemption law. Pursuant to preemption law, a " ' "conflict exists if

47

the local legislation ' "duplicates, *contradicts*, or enters an area fully occupied by general law, either expressly or by legislative implication." ' " ' " (*O'Connell*, at p. 1067, italics altered.) "A local ordinance contradicts state law when it is inimical to or cannot be reconciled with state law." (*Id.* at p. 1068, italics omitted, citing *Sherwin–Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 898 and *Ex Parte Daniels* (1920) 183 Cal. 636, 641–648.)

A comparison of Harbors and Navigation Code section 655.2 and SDMC section 63.20.15 demonstrates that SDMC section 63.20.15's broad exemption of all government employees who are operating vessels while "acting in the course of their official duties" from any speed limit contradicts the state law provision. SDMC section 63.20.15 imposes *no* speed limit on employees of government agencies, even within 200 feet of beaches or 100 feet of bathers as set forth in Harbors and Navigation Code section 655.2. That statute imposes a five mile per hour maximum speed on *all* machine propelled vessel operators, *including* government employee vessel operators, with the exception of only a *small subset of government employees*—i.e., those government employees who are "engaged in direct law enforcement activities" *and* who are displaying the requisite blue light indicator while they are so engaged. Thus, as argued by the defendants, the exemption to the speed law drawn by SDMC 63.20.15, subdivision (d) is much broader than the exemption to the speed law drawn by Harbors and Navigation Code section 655.2, subdivision (b). In adopting Harbors and Navigation Code section 655.2, the Legislature clearly did not intend to permit *all* government employees to operate vessels at any rate of speed while within 100 feet of bathers or 200 feet of a beach. Rather, the Legislature expressly indicated its intention to permit only those government employees who are actively engaged in "direct law enforcement activities" and who are displaying the

48

requisite blue light indicating that they are engaged in such activities to operate their vessels at a rate of speed exceeding the five mile per hour limit when they are within 100 feet of a bather or 200 feet of a beach (or other identified area). Given that section 63.20.15 of the SDMC imposes *no* speed limit on employees of government agencies while acting in the course of their official duties, even within 200 feet of beaches or 100 feet of bathers, SDMC section 63.20.15 contradicts the requirements of Harbors and Navigation Code section 655.2, and therefore violates section 660, subdivision (a). Thus, to the extent that SDMC 63.20.15 exempts from any speed limit those government employees who are not engaged in "direct law enforcement activities" and who are not displaying the "distinctive blue light" referenced in section 652.5 of the Harbors and Navigation Code, it cannot be given effect. Instead, Harbors and Navigation Code section 655.2's five mile per hour limit is applicable to government employees operating machine-propelled vessels within 100 feet of bathers or 200 feet of the areas identified in Harbors and Navigation Code section 655.2, subdivision (a)(2) who are not engaged in direct law enforcement activities and/or who are not displaying the blue light referenced in Harbors and Navigation Code section 652.5.

Because it is undisputed that Marino was *not* displaying the blue light intended for use by public safety vessels at the time of the incident, the trial court erred in concluding that the five mile per hour speed limit set forth in Harbors and Navigation Code section 655.2, subdivision (a) did not apply to her while she was operating her personal watercraft within 100 feet of individuals who were bathing (such as surfers like Haytasingh) and/or within 200 feet of the beach that is frequented by bathers.

b. *The court's failure to instruct the jury with respect to the speed law applicable to Marino requires reversal*

As a result of the trial court's erroneous legal conclusion with respect to the applicability of Harbors and Navigation Code section 655.2, the court failed to instruct the jury that the five mile per hour speed limit applied to Marino. The plaintiffs contend that they were entitled to such an instruction, and that the failure to give this instruction was prejudicial and requires reversal.

The defendants argue that any speed law such as the one provided in Harbors and Navigation Code section 655.2 would be relevant only to the issue of negligence per se, and not to gross negligence. Therefore, according to the defendants, even presuming that the court was incorrect about the applicability of section 655.2, the court did not err in failing to instruct the jury with respect to the speed limit set forth in that statute.[23]

"A trial court has the duty to instruct the jury on the law applicable to the facts of the case. [Citation.]" (*Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1500.) " 'A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence.' " (*McMahon v. Albany Unified*

---

[23]    Both the plaintiffs and defendants discuss this aspect of the court's asserted error—i.e., the question whether the speed law applicable to Marino was relevant to the issue of gross negligence or merely to the issue of negligence—as a question of "prejudice." However, in our view, the question whether an instruction on a particular speed law was relevant and should have been provided to the jury goes to whether the court erred in its instructions to the jury, while the question whether, absent the court's error in failing to give the instruction, it is reasonably probable that the complaining party would have obtained a more favorable result, goes to whether the instructional error prejudiced the appellant. We therefore consider both questions, in turn.

*School Dist.* (2002) 104 Cal.App.4th 1275, 1289, quoting *Soule, supra*, 8 Cal.4th at p. 572.) " 'Although a party is entitled to instructions on his [or her] theory of the case, if reasonably supported by the pleadings and the evidence, instructions must be properly selected and framed. The trial court is not required to give instructions [that] are not correct statements of the law or are incomplete or misleading [citation].' " (*Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233, 1242, quoting *Levy-Zentner Co. v. Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 782.)

We review challenges to jury instructions de novo, as a question of law. (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 845.) "[W]e view the evidence in the light most favorable to the claim of instructional error. [Citations.] In other words, we assume the jury might have believed the evidence favorable to the appellant and rendered a verdict in appellant's favor on those issues as to which it was misdirected." (*Id.* at pp. 845–846.) " ' "A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " ' " (*Id.* at p. 846.) In other words, error in instructing the jury is reversible if "there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." (*Soule, supra*, 8 Cal.4th at pp. 574, 580.) " '[R]easonable probability' " means "merely a reasonable chance, more than an abstract possibility," a " 'probability sufficient to undermine

51

confidence in the outcome.' " (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, italics omitted.)

" 'The elements of a cause of action for negligence are well established. They are "(a) a legal duty to use due care; (b) a breach of such legal duty; [and] (c) the breach as the proximate or legal cause of the resulting injury." ' " (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917.) " 'In most cases, courts have fixed no standard of care for tort liability more precise than that of a reasonably prudent person under like circumstances.' [Citation.] This is because '[e]ach case presents different conditions and situations. What would be ordinary care in one case might be negligence in another.' [Citation.]" (*Coyle v. Historic Mission Inn Corp.* (2018) 24 Cal.App.5th 627, 639–640.)

Negligence per se is an evidentiary doctrine codified at Evidence Code section 669 that provides for the application of a rebuttable presumption that a breach of the legal duty of due care has occurred where there has been a violation of a statute, ordinance or regulation. Evidence Code section 669 provides:

> "(a) The failure of a person to exercise due care is presumed if:
>
> "(1) He violated a statute, ordinance, or regulation of a public entity;
>
> "(2) The violation proximately caused death or injury to person or property;
>
> "(3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and
>
> "(4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

52

"(b) This presumption may be rebutted by proof that:

"(1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law; or

"(2) The person violating the statute, ordinance, or regulation was a child and exercised the degree of care ordinarily exercised by persons of his maturity, intelligence, and capacity under similar circumstances, but the presumption may not be rebutted by such proof if the violation occurred in the course of an activity normally engaged in only by adults and requiring adult qualifications." (*Ibid.*)

This doctrine is based on "the rule that a presumption of negligence arises from the violation of a statute which was enacted to protect a class of persons of which the plaintiff is a member against the type of harm that the plaintiff suffered as a result of the violation." (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1285.)

" 'Gross negligence' long has been defined in California and other jurisdictions as either a ' " 'want of even scant care' " ' or ' " 'an extreme departure from the ordinary standard of conduct.' " ' " (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754, quoting *Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1185–1186; *Decker, supra*, 209 Cal.App.3d at p. 358; *Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1082 ["Gross negligence is pleaded by alleging the traditional elements of negligence:  duty, breach, causation, and damages. [Citation.]  However, to set forth a claim for 'gross negligence' the plaintiff must" also allege conduct by the defendant involving either " ' " ' "want of even scant care" ' " ' or " ' "an extreme departure from the ordinary standard of

53

conduct" ' " ' "].)  It is this extreme departure from the standard of care that distinguishes gross negligence from " '[o]rdinary negligence'—an unintentional tort—consist[ing] of a failure to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm." (*Santa Barbara*, at pp. 753–754.)  " ' " '[G]ross negligence' falls short of a reckless disregard of consequences, and differs from ordinary negligence only in degree, and not in kind. . . ." ' " (*Anderson v. Fitness Internat., LLC* (2016) 4 Cal.App.5th 867, 881.)[24]

Whether conduct rises to the level of gross negligence as opposed to ordinary negligence is typically a question of fact.  (See *Decker, supra,* 209 Cal.App.3d at p. 358 ["Generally it is a triable issue of fact whether there has been such a lack of care as to constitute gross negligence [citation] but not always"]; see also *Cooper v. Kellogg* (1935) 2 Cal.2d 504, 511 ["Whether there has been such a lack of care as to constitute gross negligence is a question of fact for the determination of the trial court or jury, and this is so 'even where there is no conflict in the evidence if different conclusions upon the subject can be rationally drawn therefrom' "].)

Again, the defendants assert that the trial court's decision not to instruct the jury with respect to the applicability of the five mile per hour speed limit set forth in Harbors and Navigation Code section 655.2 was not error.  According to the defendants, "[e]vidence relating to an alleged violation by Marino of the 5 miles per hour speed limit in Harbors and

---

[24]    As Witkin explains, "The division of negligence into degrees ('slight,' 'ordinary,' and 'gross') has been criticized by modern courts and writers.  It has been pointed out that frequently, in cases where a higher 'degree' of care is said to be required, all that is meant is that the particular circumstances require a greater amount of care, but that *the standard remains the same: ordinary care under the circumstances*.  [Citations.]"  (6 Witkin, Summary of Cal. Law (11th ed. 2020) Torts, § 1000, italics altered.)

Navigation Code section 655.2 would only be relevant to a negligence per se cause of action." The defendants do not explain why they believe this is so. Instead, they simply state that "[n]umerous City lifeguards, as well as the City's expert, testified that, based on their training and understanding, City lifeguards are exempt from the 5 miles per hour speed limit in Harbors and Navigation Code section 655.2." This argument does not address why a speed limit that we have determined applies to City lifeguards would not be relevant to a claim for damages due to gross negligence, as alleged, on the part of a City lifeguard.

Although it is true, as the defendants argue, that a specific speed limit is relevant to a claim for negligence per se, it does not necessarily follow, as they also suggest, that a speed law has *no* relevance in the context of a claim for gross negligence. Again, as case law indicates, the standard of care applicable to questions of negligence and gross negligence is the same; what differs between the two is the degree of departure from that standard. (See *Anderson, supra*, 4 Cal.App.5th at p. 881 [gross negligence different from ordinary negligence in degree, not in kind].) Negligence per se is a way to establish ordinary negligence by tying the standard of care to a specific "statute, ordinance, or regulation of a public entity." (Evid. Code, § 669, subd. (a)(1).) The fact that a statute requires a particular standard of care—in this case, a speed limit in specified areas—is relevant to the question of the degree to which the conduct of the individual in question departed from that statutorily-imposed standard of care. Thus, the fact that a speed limit applies to the City employee involved in this incident would be relevant to the question whether that City employee's conduct was such a departure from the standard of care that it constituted gross negligence.

There was evidence presented that Marino was within 100 feet of Haytasingh, and within 200 feet of the beach, and that she was traveling at a rate of speed exceeding the five mile per hour limit set forth in Harbors and Navigation Code section 655.2, subdivision (a). Marino herself acknowledged that she had been traveling at two to three times this speed limit—i.e., at 10 to 15 miles per hour, at the time of the incident. Whether this rate of speed constituted an extreme departure from the standard of care was a question for the jury to answer; the jury should have been informed of the speed limit that applied to Marino at the time of the incident in order to provide the jury with context as to the appropriate standard of care from which to measure whether the conduct constituted an extreme departure. The court's failure to so instruct the jury was therefore error.

We next consider whether the failure to instruct the jury that Marino was subject to a five mile per hour speed limit was prejudicial to plaintiffs, i.e., whether there is a reasonable probability that the jury would have reached a more favorable determination for the plaintiffs if the court had provided the instruction. (See *Soule, supra*, 8 Cal.4th at p. 580.)

In cases of instructional omission, we apply the same "multifactor test" as used in cases where instructions were erroneously given. In addition to considering "the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury," a "court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule, supra*, 8 Cal.4th at pp. 580–581.)

The failure to give the requested instruction significantly limited the plaintiffs' ability to place their full case for gross negligence before the jury. The jury was not informed that state law placed a five mile per hour limit on

56

Marino while she was operating her personal watercraft—which was not displaying a blue light that would have indicated that she was engaged in law enforcement activities—within 200 feet of the beach and within 100 feet of a surfer such as Haytasingh. Indeed, the plaintiffs argue that the trial court's failure to provide any instruction about Harbors and Navigation Code section 655.2 prevented the jury from having the "opportunity" to have "the standard of care within which to judge whether or not there was an extreme departure from that standard."

With respect to the state of the evidence, Marino conceded that she was exceeding the five mile per hour speed limit, possibly by two to three times, when she testified that she was going 10 to 15 miles per hour at the time of the incident. She also agreed that she had come within 15 to 20 feet of Haytasingh. One of the plaintiffs' experts testified that Marino would have had to accelerate up to 15 miles per hour in order to overtake Haytasingh and complete the left-hand U-turn maneuver. Thus, there was evidence from which a reasonable fact-finder could have concluded that Marino was going at least three times the speed limit at the time of the incident. Although there is no pre-determined point at which one can say that a deviation from a speed limit necessarily becomes an extreme departure from the standard of care, we also cannot conclude that a jury would *never* find that traveling at three times the speed limit near a surfer constituted an extreme departure from that standard of care. The possibility that a jury might consider this an extreme departure is further bolstered by the fact that the defendants' expert on standard of care testified that "if a lifeguard violates the Harbors and Navigation Code section that is applicable to him or her, . . . they are not operating within the standard of care." He specified that such a violation would "be below the standard of care" only "[i]f [the code section] was

57

applicable to them." That same defense expert also conceded that the "Code S" that Marino was performing at the time of the incident "was a nonemergency situation," undermining the possibility that the excess speed was due to some type emergency. We therefore conclude that this factor weighs in favor of concluding that the instructional error resulted in prejudice.

Turning to the other instructions, not only did no other instructions suggest or otherwise indicate that Marino was subject to a five mile per hour speed limit on her personal watercraft pursuant to state law, but the jury was specifically instructed that she was exempt from the only speed limit mentioned in the jury instructions. The jury was *not* told that state law imposed a five mile per hour speed limit on government employees such as Marino who operate vessels that do not display the requisite blue light indicator, and in fact was told that Marino, as a government employee who was acting in the course of her official duty, was wholly exempt from a local ordinance that imposes a five mile per hour speed limit on vessels operated by those who are not governmental employees. The court instructed the jury that:

> "It is prohibited for any person in command of any vessel to use it or permit it to be used at a speed in excess of five (5) miles per hour within one thousand (1,000) feet of the beach.

> "Employees of governmental agencies are exempt from this section while acting in the course of their official duties."

Thus, the jury was told that there was, effectively, no speed-based standard of care that applied to Marino. This factor weighs in favor of a

conclusion that the trial court's omission of the requested instruction regarding Harbors and Navigation Code section 655.2 resulted in prejudice.[25]

The next factor, the effect of counsel's arguments, also weighs in favor of finding that the court's instructional error was prejudicial. Counsel for the plaintiffs was limited to arguing in closing that the City's lifeguard training materials indicate that personal watercraft are subject to a five mile per hour limit when operated within 100 feet of a surfer or bather. Lifeguard training manuals clearly do not have the same force as a state law that has specific requirements for an exemption to the speed law—requirements that undisputedly were not met here. Further, defense counsel was able to argue that Marino was exempt from the normal standard of care speed law that applies to virtually all other persons who operate a personal watercraft in the same area where Marino was operating her watercraft. Defense counsel argued in closing that Marino "wasn't speeding," and that "[s]he saw Mr. Haytasingh and when she saw him, she made the turn." Defense counsel also highlighted that Marino and other lifeguards are exempt from any five mile per hour speed limit, stating: "You heard a lot of testimony about this 5-mile-per-hour speed limit. And you heard that the lifeguards have an exemption for it and that's why they don't always abide by the 5-mile-per-hour speed limit. And you've got those instructions now, that they are exempt. [¶] That's exactly what our lifeguards told you. That's exactly what Ed Vodraska [the defense's standard of care expert] told you, that they are

---

[25] The trial court's ruling effectively rendered irrelevant a portion of a separate instruction that was given. Specifically, the court instructed the jury that "[a] surfer is a bather" and that "[t]he act of surfing is the act of bathing." However, these terms are relevant only with respect to Harbors and Navigation Code section 655.2, which imposes the five mile per hour speed limit on vessels operated within 100 feet of a person who is "bathing."

exempt from that. And the lifeguards are trained to know that they're exempt from that 5-mile-per-hour speed limit." Defense counsel also argued that SDMC section 63.20.15 exempts lifeguards from any specific speed limit that would apply to "laypeople": "Now, the next instruction - - this is one of the instructions the judge read to you. This is the local ordinance that prohibits laypeople from operating boats or jet skis in excess of 5 miles an hour within a thousand feet of the beach. [¶] But the next paragraph is what gives the lifeguard the exemption. They are exempt from that section while acting in the scope of their duties and that's exactly what Officer Marino was doing on August 3rd. So when she was operating that day 10 to 15 miles an hour at a speed that was safe for the conditions, she was not only following the law. She was following her training." Thus, the arguments of defense counsel reiterated and reinforced an incorrect statement of law—i.e., that Marino was under no obligation to comply with a five mile per hour speed limit, adding to the prejudicial effect of the court's failure to provide an instruction that accurately stated the law.

With respect to the final factor, there is no indication in the record with respect to whether the jury may have been misled. However, given the clear instruction from the trial court that Marino was *not* subject to any speed laws, it is not surprising that the jury did not ask any questions about this issue or seem confused on this point. The jury was told that Marino was exempt from SDMC 63.20.15, the only speed law that was mentioned. Under these circumstances, the fact that there is no indication from the jury as to whether they understood that she was, in fact, subject to a speed law does not suggest that no prejudice resulted from the lack of a correct instruction. Rather, it suggests that the jury took as true the court's instruction that Marino was not subject to the local speed law ordinance, and that the jury

60

remained unaware that Marino was subject to the Harbors and Navigation Code section 655.2 speed law.[26]

In sum, we cannot be certain that the trial court's failure to instruct the jury that the Harbors and Navigation Code section 655.2 speed law applied to Marino at the time of the incident did not have an impact on the jury's determination that Marino's conduct did not amount to gross negligence. Rather, we conclude that it is reasonably probable that a result more favorable to the plaintiffs would have occurred if the trial court had instructed the jury with an accurate statement of the state's vessel speed law's application to Marino. We therefore conclude that reversal of the judgment is required.

## IV.

## DISPOSITION

The judgment of the trial court is reversed. The matter is remanded for further proceedings. The plaintiffs are entitled to costs on appeal.

AARON, Acting P. J.

I CONCUR:

IRION, J.

---

[26]    As noted, during trial, one juror specifically asked the trial court whether the jury would be provided with the "entirety" of the Harbors and Navigation Code, suggesting that at least one juror was interested in the potential significance of the rules set forth in the Harbors and Navigation Code to this case.

Dato, J., Concurring.

Even in San Diego, a city known for its bays and natural harbor, we don't often decide cases that construe the Harbors and Navigation Code. So perhaps portions of our opinion in this case will be of interest to a limited audience. Yet when there are fewer cases to interpret particular legislation, each individual case takes on increased significance.

I concur in the result reached by the majority opinion and most of its reasoning. I write separately to highlight and comment on a narrow issue of statutory interpretation involving the interplay between Harbors and Navigation Code sections 650.1 and 655.2.[1] The majority opinion's resolution of that issue reaches what I believe is the correct result—the speed limits in section 655.2 apply to watercraft owned by the City of San Diego (City). But I am concerned that it does so in a way that may create problems in future cases, however rare they may be, involving other government entities.

A. *Meaning of State "Subdivision" in Section 650.1*

Among its arguments in this case, the City says that the trial court had no obligation to instruct the jury regarding the five miles per hour (5 m.p.h.) speed limit in section 655.2 because, by terms of section 650.1, the entire chapter of the Code that section 655.2 is a part of—Chapter 5—does not apply to vessels owned by the City or any other "subdivision" of the state as long as that craft is being used "principally for governmental purposes."[2]

---

[1]     All subsequent statutory references are to the Harbors and Navigation Code.

[2]     Section 650.1 is labeled, "Application of chapter." Subdivision (b) provides:
> "This chapter, except those sections which expressly indicate otherwise, shall not apply to the following:

1

Surveying cases decided in a variety of contexts, the majority opinion concludes that cities are sometimes—but not always—considered "legal" or "political" subdivisions of the state. (Compare, e.g., *Otis v. City of Los Angeles* (1942) 52 Cal.App.2d 605, 612 ["Cities . . . are not connected political subdivisions of the state."] with *Weber v. City Council of Thousand Oaks* (1973) 9 Cal.3d 950, 957 [" 'Municipal corporations are political subdivisions of the state.' "].) It points to article XI, section 1 of the California Constitution that uses the term, "legal subdivisions of the state," observing that it has been interpreted to include counties but exclude cities. (Maj. opn., *ante*, at p. 37.) It also suggests that the Legislature is usually specific if it intends a generic term like "subdivision" to include *charter* cities like San Diego.[3] (Maj. opn., *ante*, at pp. 39–40.) On this basis, it concludes

> (1) Foreign vessels temporarily using waters subject to state jurisdiction.
> (2) Military or public vessels of the United States, except recreational-type public vessels.
> (3) A vessel whose owner is a state or subdivision thereof, which is used principally for governmental purposes, and which is clearly identifiable as such.
> (4) Ship's lifeboats."

[3]   In my view, this principle regarding the applicability of state legislation to charter cities has little if any relevance to the issue in this case. Pursuant to state constitutional authority, charter cities (as distinguished from general law cities) have substantial independence regarding municipal affairs. (See *State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555.) A corollary principle is that before a court will engage in a constitutional analysis to determine whether the Legislature has infringed on a charter city's home rule authority, the legislative intent to apply the particular state law to charter cities must be clear. (*City of Redondo Beach v. Padilla* (2020) 46 Cal.App.5th 902, 913.) But this is not a case in which the City contends that the 5 m.p.h. speed limit of section 655.2 involves a municipal affair such that it runs afoul of its constitutional home

2

that "the Legislature did not intend to include charter cities . . . in the exclusion for 'the state or [its] subdivisions' set forth in section 650.1 of the Harbors and Navigations Code." (Maj. opn., *ante*, at p. 43.)

I agree with my colleagues that the fundamental question is one of legislative intent. I also agree with their implicit conclusion that the Legislature has been less than consistent in its intended meaning when it has used a variant of the term "subdivision" of the state. But unlike the majority, I think there is compelling evidence that when it referred to "subdivision" *in section 650.1*, the Legislature intended that term to include both counties and cities, as well as other local jurisdictions.

Where the issue is one of legislative intent, and the language of a statute is unclear—as we all agree it is here—we typically look to evidence of legislative history that might shed light on what the Legislature meant. (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1040.) If the legislative history is not determinative, we "may look to public policy as an aid in determining legislative intent." (*Id.* at p. 1042.)

Section 650.1 was added to the Harbors and Navigation Code in 1976 as part of Assembly Bill No. 4097 (Assembly Bill 4097), legislation designed to assure continued receipt of federal funds by the California Department of Navigation and Ocean Development. (Stats. 1976, ch. 744, § 3; see Legis. Analyst Rep., Analysis of Assem. Bill 4097 (1975–1976 Reg. Sess.) as amended Apr. 29, 1976, p. 1.) (Legislative Analyst Report). It did so by conforming California law to the Federal Boat Safety Act of 1971 (Pub.L.

---

rule authority. As a result, the clarity principle referred to in *Redondo Beach* does not apply.

No. 92-75 (Aug. 10, 1971) 85 Stat. 213 (1971 Federal Act or Act)).[4] The bill was characterized as making "minor and technical" changes. (Legis. Analyst Rep., *supra*.)

The language we are concerned with—the exemptions in section 650.1—was part of Assembly Bill 4097 as originally introduced and remained unchanged through final passage of the bill. It was copied directly from section 4 of the 1971 Federal Act.[5] Because the purpose of Assembly Bill 4097 was to conform California law to federal law, the congressional intent in enacting section 4 of the 1971 Federal Act is significant. It is thus noteworthy that the exemption language in section 4 of the Act, which Congress understood "ha[d] existed in similar form for a number of years as part of the Federal Boating Act of 1958" (H.R.Rep. 92-324, 1st Sess., p. 13; accord Sen.Rep. 92-248, 1st Sess., p. 17), in its earlier iteration excluded

---

[4] According to the bill analysis, Assembly Bill 4097 "would amend existing provisions of the Harbors and Navigation Code relating to the safe use of boats and associated equipment to provide for conformity with federal navigational laws and regulations." (Legis. Analyst Rep., *supra,* p. 1.)

[5] Section 4, entitled "Applicability," stated that the 1971 Federal Act, "except those sections where the content expressly indicates otherwise, does not apply to—
> "(1) foreign vessels temporarily using waters subject to
> United States jurisdiction;
> (2) military or public vessels of the United States, except
> recreational-type public vessels;
> (3) a vessel whose owner is a State or subdivision thereof,
> which is used principally for governmental purposes, and
> which
> is clearly identifiable as such;
> (4) ships' lifeboats."

Other than capitalization and punctuation, this language is identical to that found in section 650.1, subdivision (b).

4

"State and *municipal* vessels." (Pub.L. No. 85-911 (Sept. 2, 1958) 72 Stat. 1754, § 3(a)(3) (1958 Federal Act), italics added.)

The only specific reference to the exemptions in the California legislative history materials of which we are aware appears in a staff analysis from the Senate Transportation Committee. It describes one purpose of the bill as

> "mak[ing] the chapter on operation and equipment of vessels applicable to all vessels and equipment on waters subject to state control except:
> 1) Foreign vessels
> 2) Military or public vessels
> 3) State or *local government vessels*
> 4) Ships' lifeboats"
> (Sen. Com. on Transportation, Analysis of Assem. Bill 4097 (1975–1976 Reg. Sess.) July 22, 1976, p. 1, italics added).

Unlike state "subdivision," which in a particular constitutional context can have a specialized meaning that includes counties but excludes cities, the term "local government" does not create any comparable ambiguity. (See, e.g., Cal. Const., art. XIII B, § 8, subd. (d); *id*., art. XIII C, § 1, subd. (b); *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1031 [" 'all other governmental entities,' . . . includes both local governments (cities and counties) and local agencies"]; *San Diego Unified School Dist. v. Yee* (2018) 30 Cal.App.5th 723, 731["cities and other local governments"]; *City of Bellflower v. Cohen* (2016) 245 Cal.App.4th 438, 443 ["cities and other local government entities"]; *California School Boards Assn. v. State of California* (2009) 171 Cal.App.4th 1183, 1190, fn. 1 ["We use the term 'local governments' to refer, generally, to cities, counties, school districts, and other governmental entities"]; *City of El Monte v. Commission on State Mandates* (2000) 83 Cal.App.4th 266, 279 ["cities and other local governments"]; Board of Retirement v. Santa Barbara County Grand

5

*Jury* (1997) 58 Cal.App.4th 1185, 1191 ["counties, cities, districts and other local government agencies"].) Taking into account the legislative history of both section 650.1 and the 1971 Federal Act on which it was modeled, there is no reasonable basis to read "vessel whose owner is a [state] subdivision" as not including a jet ski owned by the City.

Apart from the relevant legislative history, we also know that on multiple occasions in the Harbors and Navigation Code, the Legislature used a variant of the term "subdivision of the state." In two instances, section 650.1 and section 656, the statutory language does not further explicate the meaning of the term.[6] In four others, however—including two within Chapter 5—the language referring to counties, cities, and "*other* political subdivision[s]" makes clear that both counties and cities *are* included within the more general category of state "subdivisions." (Italics added in first quote.) (See § 660, subd. (b) ["any body of water within the territorial limits of two or more counties, cities, or other political subdivisions"] and § 663 ["any city, county, city and county, or other political subdivision of the state"]; see also § 60.2 ["any county, city, district, or other political subdivision of this state"] and § 7148 ["[a]ny county, city and county, city, or other political subdivision or agency of the State"].) In my view, this relatively consistent usage of the term "subdivision" within the Harbors and Navigation Code to *include* cities provides additional evidence that the Legislature intended a similar meaning when it enacted section 650.1. (See *Gleason v. Santa Monica* (1962) 207 Cal.App.2d 458, 461 ["While interpretation of similar words in other statutes is not controlling, such interpretation is helpful in

---

6    One other statute, section 651, provides definitions that distinguish an "owner" from a "legal owner" and in that context refers to the "renter or lessor of a vessel to the state, or to any county, city, district, or political subdivision of the state." (*Id.,* subds. (k) & (p).)

6

arriving at the legislative intent."]; accord *Jones v. Goodman* (2020) 57 Cal.App.5th 521, 534.)

Finally, if we look to public policy, we understand that "state or subdivision thereof" must mean something beyond the state itself. Despite a footnote disclaimer (maj. opn., *ante*, at pp. 43–44, fn. 21), the clear import of the majority opinion is that this term includes counties but not cities. Still, it offers no basis to differentiate the two entities in this context. In legislating rules about the operation of watercraft in state waters, what reason would the Legislature have to regulate vessels owned by one type of local subdivision (i.e., cities) but not another (i.e., counties)? The reality is that counties provide many of the same governmental services in unincorporated areas that cities provide within municipal boundaries (see *Stirling v. Board of Supervisors* (1975) 48 Cal.App.3d 184, 187), so applying Chapter 5 to one set of local entities and exempting the other makes little sense. Moreover, by contract counties often provide municipal services for smaller cities. (See, e.g., *Geffen v. County of Los Angeles* (1987) 197 Cal.App.3d 188, 190 [lifeguard services]; *City of Los Angeles v. City of Artesia* (1977) 73 Cal.App.3d 450, 453 [law enforcement services].) If the majority opinion is correct, the rules might apply to watercraft used by lifeguards or police within larger cities but not to county-owned vessels performing the same function within smaller ones. We avoid this kind of unreasonable result if we construe "subdivision," consistent with the legislative history of section 650.1 and other references in the Harbors and Navigation Code, to include counties, cities, and other local government agencies.

7

B. *Proper Scope of the Section 650.1 Exemptions*

But if the City is a "subdivision" of the state for purposes of section 650.1, is the City also correct that the 5 m.p.h. speed limit in section 655.2 simply does not apply to it here? Can city jet skis, county boats, and foreign vessels flout state safety rules (like the speed limit) with impunity? Was that the Legislature's intent when it enacted the exemptions in section 650.1? Was that Congress's intent when it enacted the 1971 Federal Act and encouraged states to conform to it?

As previously noted, the exemptions in section 650.1 were taken verbatim from section 4(c) of the 1971 Federal Act. In turn, those section 4 exemptions were modeled on a similar set of exemptions in section 3 of the 1958 Federal Act. That 1958 legislation merely required that vessels be numbered in accord with an identification system created by the 1958 Federal Act, and the exemptions were exceptions from the numbering requirement. An exemption *from a numbering requirement* for state and local government vessels certainly does not reflect any legislative intent to exempt those classes of boats from speed limit laws.

The purpose of the 1971 Federal Act was to "improve safety in recreational boating by requiring manufacturers to build recreational boats in accordance with [federal] performance standards." (H.R.Rep. No. 92-324, 1st Sess., p. 2 (1971); see also 1971 Federal Act, § 2 [purpose of the legislation included "authorizing the establishment of national construction and performance standards for boats and associated equipment" as well as "encourag[ing] greater and continuing uniformity of boating laws and regulations as among the several States and the Federal Government"].) The thrust of the 1971 Federal Act is found in section 5, which authorized the

8

Secretary[7] to issue regulations that (1) establish "minimum safety standards for boats and associated equipment," and (2) require "the installation, carrying, or using of associated equipment on boats . . . subject to [the] Act." Section 12 generally prohibited the manufacture, delivery, importation, or use of boats or boating equipment that do not comply with the regulations and standards issued pursuant to the Act. Section 10 added a preemption clause that prevented any state from establishing or enforcing "any provision of law or regulation which establishes any boat or associated equipment performance or other safety standard, or which imposes any requirement for associated equipment, . . . which is not identical to a Federal regulation issued under section 5 of this Act." Sections 25 through 31 provided for the establishment of state boating safety programs that incorporate the substantive content of the Model State Boat Act as approved by the National Association of State Boating Law Administrators. If a state's safety program was approved by the Secretary, the state was entitled to receive full rather than partial federal funding under the Act.

The focus of the 1971 Federal Act was on creating national standards for the design, construction, and equipping of safe recreational boats. The fact that it exempts government and foreign boats and boating equipment from complying with these standards in no way suggests any intent that operators of the exempted vessels need not obey rules about driving boats and specifically local speed limits. Indeed, all reasonable inferences are to the contrary. Section 12 of the Act emphasizes this distinction between the vessels subject to the Act and the people who use them. Subdivision (d)

---

7 The Federal Act defines "Secretary" as "the Secretary of the Department in which the Coast Guard is operating." (1971 Federal Act, § 3(9).)

9

provides: "No person may use a vessel, *including one otherwise exempted by section 4(c) of this Act,* in a negligent manner so as to endanger the life, limb, or property of any person."  (Italics added.)

Returning to Assembly Bill 4097, the bill that created the exemptions in section 650.1, recall that its stated purpose was to enact "minor and technical" changes that would bring California law into "[c]onformance with federal law."  If the section 650.1 were read to exempt various classes of vessels from the speed limit requirements of section 655.2 (and, inferentially, other operational rules regarding the *use* of boats), Assembly Bill 4097 would have resulted in a major substantive change rather than a minor or technical one.  More importantly, rather than conform California law to federal law, Assembly Bill 4097 would have made California law inconsistent with the spirit of the 1971 Federal Act, if not its letter.

That the Legislature understood this limited purpose and intended this limited effect was confirmed in 1991 when it passed Assembly Bill No. 764 (Assembly Bill 764), a bill that amended section 655.2 by adding a new subdivision (b).  The amendment was an uncontroversial part of an "annual code cleanup bill" for the Department of Boating and Waterways.  (Assem. Ways and Means Com., com. to Republican Analysis of Assem. Bill 764 (1991–1992 Reg. Sess.) April 24, 1991.)  Subdivision (b) specifies that the 5 m.p.h. speed limit in subdivision (a) "does not apply to vessels engaged in direct law enforcement activities that are displaying [emergency lights] prescribed by Section 652.5."[8]  It adds that these boats "are also exempt from

---

8    Section 652.5 provides in relevant part:
        "(a)  The use of a distinctive blue light as prescribed by the
        department is reserved for public safety vessels and may be
        displayed during the day or night whenever the vessel may
        be engaged in direct law enforcement activities, including,

any locally imposed speed regulation." According to the department, this amendment was necessary because "while emergency vehicles are exempt from general speed laws on the roadway," there is no similar exemption for "law enforcement vessels on California waterways." (Natural Resources Agency, Enrolled Bill Rep. on Assem. Bill 764 (1991–1992 Reg. Sess.) prepared for Governor Wilson (July 9, 1991) p. 1; see also Assem. Ways and Means Com., com. to Republican Analysis of Assem. Bill 764, *supra,* p. 1 ["Law enforcement vessels, especially those that are duly marked, should be exempted from speed limits if they hope to catch vessels that are traveling faster than the speed limit allows."].) Clearly both the executive branch—by proposing the bill—and the legislative branch—by passing it—understood that until 1991, the 5 m.p.h. speed limit in section 655.2 applied to public as well as private boats. Following the enactment of Assembly Bill 764, there was a specific and limited exception for government vessels engaged in "direct law enforcement activities" (§ 655.2, subd. (a)) and displaying emergency lights, an exception that would have been unnecessary had there already been a more general exception applicable to any vessel owned by a state or local government entity.

I appreciate the logic of the City's argument: (1) section 650.1, subdivision (b)(3) generally exempts cities from the provisions of Chapter 5;

---

but not limited to, those activities specified in subdivision (a) of Section 663.7, or public safety activities conducted by a fire department or a fire protection district, where identification of a public safety vessel is desirable or where necessary for safety reasons.
(b)  That light when used shall be in addition to prescribed lights and day signals required by law.
(c)  The display of these blue lights on vessels for other purposes is prohibited."

(2) the 5 m.p.h. speed limit in section 655.2 is part of Chapter 5; therefore, (3) the 5 m.p.h. speed limit in section 655.2 does not apply to the City. But logic is the beginning of wisdom, not the end.[9]

We recently faced a similarly difficult issue of statutory interpretation in *Spotlight on Coastal Corruption v. Kinsey* (2020) 57 Cal.App.5th 874, in which the plaintiff relied on a similarly direct syllogism. And like this case, the difficulty involved a general statutory provision that appeared to cover a topic also addressed in different ways by more specific statutes. We explained that the trial court erred in relying on a "plain reading" of the general provision "because although statutory interpretation begins with the words in [the statute], it cannot end there." (*Id.* at p. 892 [" 'Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute.' "].) Reviewing the relevant legislative history, we observed that the statutory scheme created a latent ambiguity "because 'a literal interpretation of the statute would frustrate rather than promote the purpose of the statute or would produce absurd consequences the Legislature did not intend.' " (*Ibid.*, quoting *Varshock v. Department of Forestry & Fire Protection* (2011) 194 Cal.App.4th 635, 644; accord *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 ["Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute."].) Noting that "[p]articular provisions of law ordinarily prevail over more general provisions," we ultimately concluded that the Legislature did not intend that the general provision apply. (*Spotlight on Coastal Corruption,* at pp. 893, 900.)

---

9    Spock, Star Trek VI: The Undiscovered Country (Paramount Pictures, 1991).

Here, all of the legislative history—starting with the 1971 Federal Act, continuing to Assembly Bill 4097 (which was based on the federal statute), and then to Assembly Bill 764—reflects a consistent legislative purpose that does *not* include a wholesale exemption from the 5 m.p.h. speed limit for government owned boats.  Indeed, such a broad exemption would be inconsistent with federal law—which distinguishes between how boats are built and equipped versus how they are driven.  It would also be inconsistent with the narrow speed limit exception in section 655.2 for state and local boats actively engaged in law enforcement activities.  Consistent with our obligation to give statutes "a reasonable and commonsense interpretation" that will result in "wise policy" (*Marshall M. v. Superior Court* (1999) 75 Cal.App.4th 48, 55; accord *Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567), I would hold that the 5 m.p.h. speed limit of section 655.2 applies to *every* boat owner or operator except when a properly illuminated government vessel is being used for "law enforcement activities."

DATO, J.

Filed 11/10/21

Court of Appeal, Fourth Appellate District, Division One - No. D076228

**S270451**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

MICHAEL RAMESH HAYTASINGH et al., Plaintiffs and Appellants,

v.

CITY OF SAN DIEGO et al., Defendants and Respondents.
_____

The request for judicial notice is granted.
The petition for review is denied.
The request for an order directing partial depublication of the opinion is denied.

_____/s/_____
*Chief Justice*

HAYTASINGH v. CITY OF SAN DIEGO

S270451

Concurring Statement by Justice Groban

I agree with my colleagues that this is not an appropriate case in which to grant review, but I write separately to urge the Legislature, as did the Court of Appeal majority, to consider making commonsense changes to the relevant provisions of the Harbors and Navigation Code. I fear that uncertainty surrounding the current statutory scheme jeopardizes the safety of those in need of ocean rescue, as well as the safety of first responders who often risk their own lives to save them.

This case arises from an incident involving surfer Michael Ramesh Haytasingh and lifeguard Ashley Marino that occurred at Mission Beach in San Diego on August 3, 2013. On that day, while on duty as a lifeguard for the City of San Diego (City), Marino was operating an 11.5-foot personal watercraft. Haytasingh alleges that Marino was grossly negligent in the operation of her watercraft in his proximity, which resulted in serious injury when he attempted to avoid her.

At trial, Haytasingh requested a jury instruction stating that City lifeguards operating personal watercrafts are required to comply with the five-miles-per-hour speed limit of Harbors and Navigation Code[1] section 655.2. The trial court refused, holding that City lifeguards are exempt from the speed limit requirement. On appeal, a majority of the Court of Appeal

---

[1] All undesignated section references are to the Harbors and Navigation Code.

1

concluded that the trial court erred. The majority held that Marino's City-owned personal watercraft did not fall within the exemptions from section 655.2's speed provisions. First, Marino's City-owned personal watercraft did not qualify for an exemption from the speed limit because it was not "[a] vessel whose owner is a state or subdivision thereof" (§ 650.1, subd. (b)(3)). (*Haytasingh v. City of San Diego* (2021) 66 Cal.App.5th 429, 458–464 (*Haytasingh*).) Second, San Diego Municipal Code section 63.20.15's broader exemption from any speed limit for all government employees operating vessels in their official capacities could not apply because it impermissibly conflicted with Harbors and Navigation Code section 655.2, subdivision (b), which only exempts vessels "engaged in direct law enforcement activities that are displaying the lights prescribed by Section 652.5." (See *Haytasingh*, at pp. 464–466, citing, inter alia, § 660, subd. (a) [any local "measure shall not conflict with this chapter"].) Finally, since it was "undisputed" that Marino's vessel did not possess such lights prescribed by section 652.5, her City-owned personal watercraft could not fall within that exemption either. (*Haytasingh*, at p. 466.)

As persuasively pointed out in amicus curiae letters from various cities and city-run lifeguard services departments, all supporting City and Marino's petition for review, this current statutory framework presents a myriad of problems.

With respect to the Court of Appeal's determination that cities are not exempt as "subdivisions" of the state, the parties debate whether it makes sense for county and state lifeguards to be exempt from section 655.2's speed limit pursuant to section 650.1 while city lifeguards are not. As for the Court of Appeal's determination that City lifeguard vessels are not covered by the San Diego Municipal Code's exemption for all government

2

employees operating vessels in their official capacities, the parties disagree about whether the Legislature actually intended to limit cities' authority to regulate harbor speed limits. Because the Legislature is best situated to make these very determinations, I echo the Court of Appeal majority's call for the Legislature to clarify its intent.[2]

Clarification is crucial because, without further guidance, there is remaining uncertainty about whether city-owned watercraft can *ever* be exempt from section 655.2's five-miles-per-hour speed limit. The Court of Appeal majority suggests that, even if the above-described exemptions do not apply to cities, city-owned watercraft may still be exempt from section 655.2's speed limit if they are "engaged in direct law enforcement activities" and displaying the distinctive blue lights prescribed by section 652.5 (§ 655.2, subd. (b)). (*Haytasingh*, *supra*, 66 Cal.App.5th at p. 466.) However, it is unclear whether personal watercrafts engaged in lifeguarding services can, or should, qualify for section 655.2, subdivision (b)'s "blue light" exemption. As the City of Encinitas explains in its amicus curiae letter, "The vessels are not marked, lighted or intended as a law enforcement vessel but as a life safety platform with the primary mission of the Rescue Craft being rescue, patrol, and surveillance." Furthermore, even if these watercraft are law enforcement vessels and thereby exempt from the speed

---

[2] See *Haytasingh*, *supra*, 66 Cal.App.5th at page 464 ("[G]iven the ambiguity in Harbors and Navigation Code section 650.1, subdivision (b)(3), and particularly in its interaction with the speed limit set forth in section 655.2 of that same code, we respectfully invite the Legislature to consider amending portions of chapter 5 of division 3 of the Harbors and Navigation Code to clarify its intent with respect to these provisions").

limit as long as they display the "distinctive" blue lights required by the statute, it may be difficult and expensive to comply with the exacting lighting requirements. (Cal. Code Regs., tit. 14, § 6591 ["The distinctive light prescribed by Section 652.5, Harbors and Navigation Code, for law enforcement vessels shall be a blue colored, revolving horizontal beam, low intensity light rotating or appearing to rotate because of a pulsating effect gained by means of a rotating reflector which causes a flashing or periodic peak intensity effect. The light shall be located at any effective point on the forward exterior of the vessel"].) Not only are the lighting requirements highly technical but, as amicus curiae the City of Santa Cruz explains, "[Rescue watercrafts] are small craft with little room for a blue light."

If city-owned personal watercrafts engaged in lifeguarding services cannot qualify for any of the exemptions from section 655.2's speed limit, the result is quite troubling. This would mean that such vessels cannot exceed five miles per hour within 100 feet of bathers, which includes surfers and swimmers, or within 200 feet of "[a] beach frequented by bathers." (§ 655.2, subd. (a)(2)(A); see § 651.1.) As amici curiae explain, such a limitation on lifesaving personal watercrafts, which regularly operate in rough surf in an attempt to rescue bathers who are in grave danger, imperils public safety. The City of San Diego Fire-Rescue Department's Lifeguard Services Division aptly describes the concern: "Every second responding to a water rescue is integral to a positive outcome. Once a drowning victim slips under the surface of the water, the rate of survival and recovery becomes exponentially worse. The [rescue watercraft], due to its speed, power, and high vantage point on the water, is a force multiplier and the most effective lifesaving tool inside

4

the surf line." Indeed, without an exemption from the five-miles-per-hour speed limit, these important rescue watercraft may be rendered useless as a lifesaving aid (the City of San Diego Fire-Rescue Department's Lifeguard Services Division explains that "[t]he idle speed of [a rescue watercraft] in flat water is approximately 5 mph and a restriction to this use of speed would render the vessel unsuitable for rescue operations"). It will be of little comfort to the next swimmer or surfer in peril to learn that the most effective means of saving him or her is unavailable due to a latent ambiguity in the Harbors and Navigation Code. I urge the Legislature to address this ambiguity forthwith.

**GROBAN, J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**JENKINS, J.**